**Susan M. W. NORWICK, Plaintiff,**

**Tarja U. K. Dachinger,
Intervenor-Plaintiff,**

**v.**

**Ewald NYQUIST, Individually and as Commissioner of the New York State Department of Education, et al., Defendants.**

**No. 74 Civ. 2798(WCC).**

United States District Court,
S. D. New York.

July 20, 1976.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants; Joel Lewittes, Judith A. Gordon, Asst. Attys. Gen., New York City, of counsel.

New York Civil Liberties Union, New York City, for plaintiffs; Bruce J. Ennis, of counsel.

Before FEINBERG, Circuit Judge, and PIERCE and CONNER, District Judges.

## OPINION

CONNER, District Judge.

This action represents yet another chapter in the expanding volume of cases involving constitutional challenges to State statutes and regulations designed to limit certain types of employment to citizens, thereby excluding, among others, permanent resident aliens.[1] In the present case, plaintiffs[2] contest the validity of Section 3001(3) of the New York Education Law, which provides that no alien may be employed to teach in the public schools of New York State (the public schools), unless and until that alien has made application to become a United States citizen and thereafter proceeds, in due course, to become a citizen.[3]

Plaintiffs, aliens who have elected to retain their native citizenship (non-applicant aliens), have both applied for certification to teach in the public schools. However, because they do not fit within the limited exceptions to Section 3001(3), plaintiffs have been denied certification.[4] It is undis-

---

[1] See, e. g., *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Foley v. Connelie,* 75 Civ. 4548 (S.D.N.Y. July 8, 1976); *Surmeli v. New York,* 412 F.Supp. 394 (S.D.N.Y.1976); *C.D.R. Enterprises, Ltd. v. Board of Education of the City of New York,* 412 F.Supp. 1164 (E.D.N.Y.1976); *Mauclet v. Nyquist,* 406 F.Supp. 1233 (E.D.N.Y.1976).

[2] Plaintiff Susan M. W. Norwick was born in Dundee, Scotland and is a British subject. Married to a United States citizen, she is a federally registered resident alien and has resided in this country since 1965. Ms. Norwick is a graduate of North Adams State College in Massachusetts, where she received a B.A. degree *summa cum laude.* She is presently a full-time graduate student in Developmental Reading at the State University of New York at Albany, where she has compiled a straight A average. Since 1960, Ms. Norwick has been periodically employed as a teacher both in this country and in Great Britain.

Intervenor-plaintiff Tarja U. K. Dachinger was born in Turku, Finland and remains a citizen of that country. Ms. Dachinger majored in German at Lehman College, from which she received a B.A. degree *cum laude* and an M.S. degree in Early Childhood Education. She is married to a U. S. citizen and has resided in this country since 1966.

[3] Section 3001(3) provides, *inter alia:*
"No person shall be employed or authorized to teach in the public schools of this state who is:
. * * * * *
3. Not a citizen. The provisions of this subdivision shall not apply, however, to an alien [who] make[s] due application to become a citizen and thereafter within the time prescribed by law shall become a citizen."

[4] The only exceptions to Section 3001(3) are contained in Section 3001-a of the New York Education Law and Section 80.2(i) of 8 New York Code of Rules and Regulations.

New York Education Law § 3001-a provides: "A person, not a citizen, who files with the department satisfactory proof that he has filed with the attorney general of the United States a first preference petition pursuant to section two hundred three (a)(1) of the immigration and nationality act [8 U.S.C.A. § 1153(a)(1)] and that said petition has been approved by such attorney general upon certification by the department of justice, immigration and naturalization service, that he is unable to adjust his status to that of a lawful permanent resident of the United States solely because of an oversubscribed quota to which he is chargeable may receive from the commissioner of education, notwithstanding the provisions of subdivision three of section three thousand one of this chapter, a temporary permit validating his employment in a teaching capacity in the public schools of the state. Such temporary permit shall be valid for one year from the date of issue and may, upon proper application to the commissioner, be once renewed for a further period of one year. Such application shall be in the form required by the commissioner. Such applicant shall not be employed until he shall have taken and subscribed the following oath or affirmation:
'I do solemnly swear (or affirm) that I will support the constitution of the United States of America and the constitution of the State of

puted that, in both cases, the denial of certification has borne no relation to plaintiffs' general character or qualifications, but rather, is solely the product of their status as non-applicant aliens.

On June 27, 1974, plaintiff Norwick commenced this action for injunctive and declaratory relief. She asserts, in addition to other claims, a cause of action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343. With the consent of defendants,[5] the Court entered orders dated September 9, 1975 and December 18, 1975, convening a three-judge constitutional court pursuant to 28 U.S.C. §§ 2281 and 2284 and granting plaintiff Dachinger's motion to intervene.

Presently before the Court is plaintiffs' motion, pursuant to Rule 56 F.R.Civ.P., for a summary judgment declaring Section 3001(3) unconstitutional and enjoining its further enforcement.

## I.

It is beyond reasonable dispute that the power of New York, or any other State, to promulgate regulatory legislation such as Section 3001(3) is qualified by various provisions of the United States Constitution. In this case, plaintiffs claim that the ban of Section 3001(3)[6] on certification of non-applicant aliens for teaching positions in the public schools offends the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Supremacy Clause of Article VI.

We are not insensible of the Supreme Court's admonition that a three-judge court should consider constitutional challenges to State statutes only if non-constitutional "statutory" Supremacy Clause issues, within the jurisdiction of a single judge, prove not to be dispositive. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Nonetheless, it should be stressed that *Hagans* has neither expanded nor diminished the basic jurisdictional authority of either single-judge or three-judge district courts. To the contrary, the *Hagans* ruling is addressed to procedure only. Thus, the *Hagans* Court, in the interests of judicial economy and in light of " 'the constrictive view of * * * three-judge [court] jurisdiction which [the Supreme Court] has traditionally taken'," concluded and directed that the single judge should exhaust all potentially dispositive claims within his jurisdiction before resort to a

New York, and that I will faithfully discharge, according to the best of my ability, the duties of the position of . . . . . (title of position and name or designation of school, college, university or institution to be here inserted), to which I am now assigned.' The affidavit and oath required by this section shall be administered by the superintendent of schools having jurisdiction over the school district in which such person is to be employed or his duly authorized representative and shall be filed with the commissioner of education. Copies thereof shall be filed with the superintendent of schools."

Section 80.2(i) of 8 New York Code of Rules and Regulations provides:

"*Citizenship.* A teacher who is not a citizen of the United States or who has not declared intention of becoming a citizen may be issued a provisional certificate providing such teacher has the appropriate educational qualifications as defined in the regulations and (1) possesses skills or competencies not readily available among teachers holding citizenship, or (2) is unable to declare intention of becoming a citizen for valid statutory reasons."

5. The individual defendants, public officials serving within the New York State Department of Education, are responsible for the implementation and enforcement of the statutes and regulation challenged herein.

6. Although the complaints filed in this action refer to "Sections 3001 and 3001–a of the New York Education Law and Section 80.2 of the Regulations of the Commissioner of Education of the State of New York," it is clear that a ruling on the constitutionality of Section 3001(3) will be dispositive of this entire case. None of the other subdivisions of Section 3001 has been challenged in this action. Sections 3001–a and 80.2(i), which provide limited exceptions to Section 3001(3), are challenged only to the extent that as exceptions to a disallowance they might imply the existence of a disallowance. This Court need only note that, should we find it necessary to invalidate Section 3001(3), Sections 3001–a and 80.2(i) could not conceivably operate to deny plaintiffs the certification they require to teach. Accordingly, we restrict our review to Section 3001(3). See *In re Griffiths,* 413 U.S. 717, 726, 93 S.Ct. 2851, 37 L.Ed.2d 910 n.17 (1973).

three-judge court. Hence, where constitutional claims over which a three-judge court would have exclusive jurisdiction coincide with non-constitutional claims reviewable by a single judge, *Hagans* directs the single judge, before convention of a three-judge court, to do no more than the latter would itself be required to do, *i. e.,* to dispose of the litigation on non-constitutional grounds, if possible, pursuant to the well settled rule that "a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available." *Hagans v. Lavine, supra,* at 546–47, 94 S.Ct., at 1384.

■ Typically, the *Hagans* doctrine has been applied to cases in which specific State statutes or regulations are asserted to be in conflict with specific federal statutory or regulatory provisions, *e. g., Holley v. Lavine,* 529 F.2d 1294, 1296 (2d Cir. 1976); *Roe v. Norton,* 522 F.2d 928 (2d Cir. 1975); *Roe v. Ferguson,* 515 F.2d 279 (6th Cir. 1975); *Brown v. Beal,* 404 F.Supp. 770 (E.D.Pa. 1975). In such cases, it is the single judge's office merely to "interpret[ ] the [applicable] statute and * * * regulation," *Holley v. Lavine, supra* at 1296, and to determine whether there is a conflict with federal enactments addressed to the same subject matter. It is axiomatic that, should the reviewing judge identify such a conflict, under the Supremacy Clause the State statute must defer to the federal. It was that type of question, resting upon a statutory comparison, that *Hagans* denominated a "Supremacy Clause ('statutory')" issue. *Hagans v. Lavine, supra,* 415 U.S., at 545, 94 S.Ct. 1372. Although, within such a context, a State statute or regulation may be declared "unconstitutional," *i. e.,* violative of the Supremacy Clause, see, *e. g., DeCanas v. Bica,* 424 U.S. 351, 354, 96 S.Ct. 933, 936, 47 L.Ed.2d 43, (1976), the judge can decide the issue without having to interpret the Constitution.

This is a very different case. Here, despite plaintiffs' sweeping citation to the bulk of the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., the purported conflict underlying plaintiffs' Supremacy Clause argument is not between Section 3001(3) and any specific enactment of Congress, but rather, between Section 3001(3) and the exclusive power to regulate immigration and naturalization vested in the federal government by Article I, Section 8, clause 4 of the United States Constitution. Unlike the clearly "statutory" Supremacy Clause argument in *Hagans,* the Supremacy Clause argument in this case derives exclusively and directly from the Federal Constitution rather than from federal legislation, entails an immediate resort to the Constitution and, if "substantial," see *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973), requires the convention of a three-judge court.

The conclusion that the present Supremacy Clause argument is "constitutional" rather than "statutory" is supported, inferentially, by a number of similar cases. Thus, in *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Supreme Court ruled in favor of the alien plaintiffs on *both* equal protection and Supremacy Clause grounds. In *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Supreme Court elected to affirm the lower court on equal protection grounds, ignoring the Supremacy Clause argument that had been adopted by the court below. Although these decisions are pre-*Hagans,* they by no means pre-date the doctrine that constitutional rulings are to be avoided whenever possible. More recently, in a post-*Hagans* decision, Judge Gurfein, writing for a three-judge panel in the Eastern District of New York, ruled New York Labor Law Section 222 unconstitutional on both equal protection and Supremacy Clause grounds, *C.D.R. Enterprises, Ltd. v. Board of Education of the City of New York,* 412 F.Supp. 1164 (E.D.N.Y. 1976), without any discussion of *Hagans.*

We therefore believe that the Supremacy Clause claim herein is more properly viewed as a true "constitutional" argument which was thus beyond the convening court's jurisdiction. In any event, the determination whether it is constitutional or statutory is at least sufficiently troublesome that *Ha-*

*gans'* stated objective of judicial efficiency would seem better served not by the extensive digression which such determination would require but by proceeding directly to the clearly constitutional equal protection argument which we find dispositive.

For reasons outlined in considerable detail below, this Court concludes that Section 3001(3) violates the Equal Protection Clause of the fourteenth amendment. Thus, plaintiffs' motion for summary judgment must be granted and we need not consider plaintiffs' due process and Supremacy Clause arguments.

## II.

At the threshold of any equal protection analysis, a reviewing court must of course identify the standard of judicial scrutiny that is appropriate to the case before it. Under familiar principles, if a regulation impinges upon a "fundamental right," *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), or creates an inherently "suspect classification" such as race, nationality or alienage, the challenged provision will be subjected to "close judicial scrutiny," requiring the State to establish a "compelling" interest in its enactment. See, *e. g., Graham v. Richardson, supra*, 403 U.S., at 372–75, 91 S.Ct. 1848 (1971). As the Supreme Court has recently observed, a State that employs

"a suspect classification 'bears a heavy burden of justification,' * * *, a burden which, though variously formulated requires [a] State to * * * show that

its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary * * * to the accomplishment' of its purpose or the safeguarding of its interest." *In re Griffiths*, 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910 (1973) (footnotes omitted).

If, on the other hand, the regulation does not affect a fundamental right or create a suspect classification, it has traditionally been accorded a presumption of constitutionality that may not be disturbed unless the enactment is shown to rest on grounds "wholly irrelevant to the achievement of [a legitimate] state[ ] objective." *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); see also *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Metropolis Theater Co. v. City of Chicago*, 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730 (1913).[7]

In an effort to avoid the "heavy burden" imposed upon those seeking to establish a compelling state interest in a particular legislation, defendants refer us to the several Supreme Court decisions that have measured the constitutionality of a number of state statutes against the more lenient "rational relationship" standard. *Schware v. Board of Law Examiners of New Mexico*, 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Kotch v. Board of River Port Pilot Commissioners*, 330 U.S. 552, 556, 67 S.Ct. 910, 91 L.Ed. 1093 (1947).[8]

---

**7.** In recent years, the Supreme Court has apparently been less willing to accord even those statutes involving non-fundamental, non-suspect categories the virtually automatic approval that such legislation had historically enjoyed. The Court has indicated that a statute creating any classification must at least

" be reasonable, not arbitrary, and must rest upon some ground of difference having a *fair and substantial* relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (emphasis added).

See generally Gunther, The Supreme Court 1971 Term, Foreword: In Search of Evolving Doctrine of a Changing Court: A Model for a

Newer Equal Protection, 86 Harv.L.Rev. 1 (1972); Note, Legislative Purpose, Rationality and Equal Protection, 82 Yale L.J. 123 (1972). See also *Massachusetts Bd. of Retirement v. Murgia*, —— U.S. ——, ——, 96 S.Ct. 2562, 2568, 49 L.Ed.2d —— (1976) (Marshall, J., dissenting).

**8.** Defendants also direct the Court to *Law Students Research Council v. Wadmond*, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), and *United Public Workers of America v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). In *Wadmond*, the Supreme Court considered a challenge, on first amendment vagueness and overbreadth grounds, to New York's system for screening applicants for admission to the bar. *United Public Workers* involved a first amend-

Defendants correctly observe that the cited cases, like that at bar, involve constitutional challenges to State statutes regulating professions or trades invested with a strong public interest. On the basis of that kinship, defendants urge us to adopt here the same standard of review. We cannot do so. The appropriate standard of judicial review is determined, not by the strength of the public interest sought to be protected, but rather by the nature of the right (fundamental or not) being regulated and/or the type of classification (suspect or not) which the regulation creates. Since none of the Supreme Court decisions cited above involved a statute affecting any fundamental right or creating any suspect classification, application of the rational relationship test was there indicated. That is not the situation here.

Ninety years ago, the Supreme Court first ruled that an alien is a "person" entitled to the safeguards afforded by the Due Process and Equal Protection Clauses of the fourteenth amendment. *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). See also *In re Griffiths, supra,* 413 U.S., at 719–20, 93 S.Ct. 2851; *Sugarman v. Dougall,* 413 U.S. 634, 641, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson, supra,* 403 U.S., at 371, 91 S.Ct. 1848; *Takahashi v. Fish & Game Commission,* 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Truax v. Raich,* 239 U.S. 33, 39, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896). Those safeguards were subsequently ruled to protect aliens seeking employment "in the common occupations of the communi-

ty," [9] *Truax v. Raich, supra,* 239 U.S., at 41, 36 S.Ct., at 10; *Sugarman v. Dougall, supra,* 413 U.S., at 641, 93 S.Ct. 2842. Indeed, the power "to apply [State] laws exclusively to * * * alien[s] * * * as a class [has been steadily] confined within narrow limits." *Takahashi v. Fish & Game Commission, supra,* 334 U.S., at 420, 68 S.Ct., at 1143. However, the precise standard for judicial review of statutes creating classifications based on alienage remained undefined until this decade. Finally, in the landmark case of *Graham v. Richardson, supra,* the Supreme Court, in striking down a State statute denying welfare benefits to resident aliens, ruled that

> "classifications based on alienage * * are inherently suspect and subject to close judicial scrutiny." *Id.,* 403 U.S. at 372, 91 S.Ct. at 1852.

Writing for the Court, Justice Blackmun observed that

> "[a]liens as a class are a prime example of a 'discrete and insular' minority * * * for whom such heightened judicial solicitude is appropriate." *Id.,* 403 U.S., at 372, 91 S.Ct., at 1852.

In subsequent decisions, the Supreme Court has applied the rationale of *Graham* to its review of State statutes foreclosing aliens from a variety of public and non-public jobs.

Thus, in *Sugarman v. Dougall, supra,* the Supreme Court considered an equal protection challenge to Section 53 of the New York Civil Service Law, which denied aliens the right to hold positions in New York's "competitive civil service." Section 53 did not survive the *Sugarman* Court's strict

---

ment challenge to the so-called "Hatch Act," which statute prohibited federal employees from taking "any active part in political management or in political campaigns." Suffice it to say that we have read both cases and are at a loss to determine their relevance to our present inquiry.

**9.** To the extent that defendants would invoke the authority of *Heim v. McCall,* 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915), and *Crane v. New York,* 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915), this Court need only note that— whatever the constitutional status of public

employment in 1915—more recent decisions make it clear that the States owe all of their lawful residents, whether aliens or citizens, equal access to public as well as private employment, absent the necessity for restrictions designed to promote compelling state interests. *Sugarman v. Dougall,* 413 U.S. 634, 643–45, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson,* 403 U.S. 365, 370–75, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). See *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero,* —— U.S. ——, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

scrutiny. Having indicated that Section 53 was both overinclusive and underinclusive, the Court rested its ruling on the statute's fatal imprecision.

Decided the same day as *Sugarman* was *In re Griffiths, supra,* in which the Supreme Court condemned a Connecticut statute that excluded aliens from the practice of law. Earlier this year, Judge Weinfeld, in striking down Section 6524(6) of New York's Education Law,[10] offered the following précis of the *Griffiths* decision:

"The Court premised its judgment upon basic constitutional concepts: first, that a lawfully admitted resident alien is a 'person' within the Fourteenth Amendment's prohibition against denial 'to any person within its jurisdiction the equal protection of the laws'; second, that the 'right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure'; third, that 'classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny'; fourth, that a state which adopts a suspect classification 'bears a heavy burden of justification'; and fifth, that 'to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial and that its use is "necessary * * * to the accomplishment" of its purpose or the safeguarding of its interest'." *Surmeli v. New York,* 412 F.Supp. 394 (S.D.N.Y. 1976) (footnotes omitted).

■ It is the opinion of this panel that *Graham, Sugarman* and *Griffiths* establish,

beyond peradventure, that any challenged State statute or regulation placing aliens, as a class, at a disadvantage vis-à-vis citizens must withstand the rigors of close judicial scrutiny.[11] Thus, the deprivation protested by plaintiffs herein can be justified only if Section 3001(3) is shown to be a *necessary* implement of a *compelling* state interest. We "therefore look to the substantiality of the State's interest in enforcing [Section 3001(3)], and to the narrowness of the limits within which the discrimination is confined." *Sugarman v. Dougall, supra,* 413 U.S., at 642, 93 S.Ct., at 2847.

### III.

■ In attempted justification of Section 3001(3), defendants assert that, "Given the vital role of the educational system in the American democracy," the State has a compelling interest in the assurance that those who minister to the educational needs of its young are qualified, both by profession and example, to transmit the American heritage to their students. Thus, defendants argue, in furtherance of this interest,

"it * * * does not offend the equal protection rights of aliens to require that in order to obtain teaching positions within that system, they act affirmatively to identify themselves with that democracy. By obtaining declarant status (and timely completing the naturalization process), the alien has provided objective evidence that he in fact believes in the American heritage which he in turn is obliged to transmit to his students."

Defendants urge that the State-required oath of allegiance, in which plaintiffs expressly stand ready to join, is an inadequate badge of identification with the United

---

**10.** Section 6524(6) required citizenship, or the declared intention to become a citizen, as a condition of retaining a license to practice medicine.

**11.** On June 17, 1976, the Supreme Court, reconfirming the standards established by *Graham, Sugarman* and *Griffiths,* struck down a Puerto Rico statute that prohibited aliens from engaging in the private practice of engineering. *Examining Bd. of Engineers, Architects and Sur-*

*veyors v. Flores de Otero,* —— U.S. ——, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

It is also noteworthy that Justice Rehnquist, though critical of the rule, recognized in his dissent in *Sugarman* that

"[t]he Court in [*Sugarman* and *Griffiths*] holds that an alien is not really different from a citizen, and that any legislative classification on the basis of alienage is 'inherently suspect'." *Id.,* 413 U.S., at 649, 93 S.Ct., at 2861.

States.[12] Section 3001(3), defendants conclude, "is certainly an appropriate if not the 'least drastic means' for effectuating" the interest it was enacted to support.

To be sure, a "teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the State has a vital concern." *Adler v. Board of Education*, 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517 (1952). Accordingly, "[t]here can be no doubt of the right of a State to investigate the competence and fitness of those whom it hires to teach in its schools * * *," *Shelton v. Tucker*, 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1965) (footnote omitted), and there is "no requirement * * * that a teacher's classroom conduct be the sole basis for determining * * * fitness." *Beilan v. Board of Education*, 357 U.S. 399, 406, 78 S.Ct. 1317, 1322, 2 L.Ed.2d 1414 (1958). Moreover, in a somewhat different context, the Supreme Court has acknowledged that

the "State's broad power to define its political community" might include "requir[ing] citizenship" in "an appropriately defined class of positions." *Sugarman v. Dougall, supra*, 413 U.S., at 642–43, 646–47, 93 S.Ct., at 2850.

Thus aware that the Supreme Court has recognized a strong nexus between the classroom and the political community, and that it has at least intimated its approval of citizenship requirements for jobs bearing a relationship to the State's ability to "define its political community," one might infer that teaching fits within the narrow area of allowable discrimination discussed in *Sugarman*.[13]

This Court must be no less aware, however, of *Sugarman*'s ultimate stricture: when a State seeks to vindicate even a compelling interest, through discrimination, "the means the State employs must be precisely drawn in light of the acknowledged purpose." *Id.* 413 U.S., at 653, 93 S.Ct., at 2863. Even if Section 3001(3) had safely

---

12. In *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), the Supreme Court noted:

"We find no merit in the contention that only citizens can in good conscience take an oath to support the Constitution. We note that all persons inducted into the Armed Services, including resident aliens, are required by 10 U.S.C. § 502 to take the following oath:

'I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God.' If aliens can take this oath when the Nation is making use of their services in the national defense, resident alien applicants for admission to the bar surely cannot be precluded, as a class, from taking an oath to support the Constitution on the theory that they are unable to take the oath in good faith." *Id.* at 726, 93 S.Ct. at 2857 n. 18.

13. On the same day that it decided *Sugarman v. Dougall, supra*, and *In re Griffiths, supra,* the Supreme Court summarily affirmed a District of Arizona decision that had invalidated, on equal protection grounds, a State statutory and constitutional scheme excluding aliens from a broad range of public jobs, numbered among

which was teaching. *Miranda v. Nelson*, 351 F.Supp. 735 (1973), aff'd, 413 U.S. 902, 93 S.Ct. 3065, 37 L.Ed.2d 1021 (1973). Whatever the weight of precedential authority accorded summary affirmances of the Supreme Court, see *Hicks v. Miranda*, 422 U.S. 332, 343–46, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Fusari v. Steinberg*, 419 U.S. 379, 391–92, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C. J., concurring); *Edelman v. Jordon*, 415 U.S. 651, 671, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir.), *cert. denied sub nom. Doe v. Brennan*, 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973); Note, Aliens' Right to Teach; Political Socialization and the Public Schools, 85 Yale L.J. 90, 99 n. 45 (1975), *Miranda*'s relevance to this case should not be overestimated.

Although one of the named plaintiffs in *Miranda* was a teacher, the case involved, as noted above, a broad-based challenge to an Arizona policy that precluded aliens from public employment in general. The *Miranda* defendants' arguments, as well as the court's analysis, centered upon the "special public interest" doctrine. The opinion affirmed by the Supreme Court did not focus upon—or, indeed, allude to—the State's peculiar and particular interests in regulating the teaching profession. Thus, the Supreme Court's summary affirmance in *Miranda* would provide an unsteady foundation upon which to rest a decision in the present case.

negotiated all of the other shoals, on this rock it clearly founders.

Defendants have attempted to justify the sweeping breadth of Section 3001(3) by exhuming an argument laid to rest in *Griffiths* and *Sugarman*, contrasting the undivided allegiance which a citizen presumptively bears to this country with a resident alien's potential conflict of loyalties. On the basis of this supposed conflict, defendants would have us conclusively presume that all those who elect not to seek U. S. citizenship, regardless of their nation of birth, the academic subject they seek to teach, the nature and strength of their ties to this country or their willingness to pledge allegiance to it, are unqualified for such responsibilities.

The Supreme Court rejected a like "undivided allegiance" argument advanced by the defendants in *Sugarman* because, in that case,

> "the State's broad prohibition of the employment of aliens applies to many positions with respect to which the State's proffered justification has little, if any, relationship. At the same time, the prohibition has no application at all to positions that would seem naturally to fall within the State's asserted purpose.
>
> \* \* \* \* \* \*
>
> [Section 53's] imposed ineligibility may apply to the 'sanitation man, class B,' *Perotta v. Gregory*, 4 Misc.2d 769, 158 N.Y.S.2d 221 (1957), to the typist, and to the office worker, as well as to the person who directly participates in the formulation and execution of important state policy. The citizenship restriction sweeps indiscriminately." *Id.*, 413 U.S., at 642–43, 93 S.Ct., at 2848–49.

As with the statute challenged in *Sugarman*, Section 3001(3) is damned by its imprecision. It excludes *all* non-applicant aliens, regardless of nationality, from *all* teaching positions in the public school system, regardless of grade level or subject matter.[14] It thus bars British subjects seeking certification to teach mathematics or physical education as well as Soviet citizens seeking to teach civics or economics. The statute's imprecision becomes even more glaring when one considers that the prohibition does not extend to those who teach the thousands of New York children attending private schools. Indeed, even in the public schools, under an amorphous exception to Section 3001(3), the State would permit a non-applicant alien to obtain certification to teach certain subjects requiring "skills or competencies not readily available among teachers holding citizenship."

In *Griffiths*, the undivided allegiance argument was labeled "unconvincing" and the Supreme Court declared the possibility that some aliens might be unsuited to a particular profession no "justification for a wholesale ban." *Id.* 413 U.S., at 725, 93 S.Ct. 2851; *cf. Hampton v. Mow Sun Wong*, —— U.S. ——, ——, 96 S.Ct. 1895, 1912, 48 L.Ed.2d 495, 44 U.S.L.W. 4737, 4745 (1976). The applicability of the reasoning of *Griffiths* to the statute challenged here is apparent from the following quotation from that opinion, substituting appropriate references to the State and profession involved:

> "Although, as we have acknowledged, a State does have a substantial interest in the qualifications of those [certified to teach in the public schools], the arguments advanced by the [defendants] fall short of showing that the classification

---

14. Defendants have taken pains to depict Section 3001(3) as a carefully circumscribed legislative effort to promote continued patriotism among our citizenry. They have chosen to ignore the fact that Section 3001(3) is but one aspect of a rather comprehensive statutory schema, embodied in the Education Law, prohibiting the alien from participation in a broad range of employments—including that of physician (§ 6524), physical therapist (§ 6534), chiropractor (§ 6554), dentist (§ 6604), veterinarian (§ 6704), pharmacist (§ 6805), professional engineer (§ 7206), landscape architect (§ 7324), shorthand reporter (§ 7504), and masseur (§ 7804). The Education Law, however, specifically provides that citizenship is not a qualification for licensure in the following professions: professional and practical nursing (§§ 6904 and 6905), podiatry (§ 7004), optometry (§ 7104), ophthalmic dispensing (§ 7124), architecture (§ 7304), certified public accountancy (§ 7404), psychology (§ 7603) and social work (§ 7704).

established by [Section 3001(3)] is necessary to the promoting or safeguarding of this interest. [New York] has wide freedom to gauge on a case-by-case basis the fitness of an applicant to [teach]. * * * [New York] can * * * require appropriate training and familiarity with [the subject matter to be taught]. Apart from such tests of competence, it requires a new [teacher] to take [an oath] to 'support the constitution of the United States, and the constitution of the State of [New York].' [Plaintiffs have] indicated [their] willingness and ability to subscribe to the * * *' oath [ ], and [New York] may quite properly conduct a character investigation to insure in any given case 'that an applicant is not one who "swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath." *Bond v. Floyd*, 385 U.S. 116, 132 [87 S.Ct. 339, 17 L.Ed.2d 235].' *Law Students Research Council v. Wadmond*, 401 U.S., at 164 [91 S.Ct. 720]. Moreover, [teachers] are subject to continuing scrutiny by [their superiors]. * * *. In sum, [defendants] simply [have] not established that [the State] must exclude all aliens from the [teaching profession] in order to vindicate its undoubted interest * * *." *In re Griffiths, supra*, 413 U.S., at 725–26, 93 S.Ct., at 2856–57 (footnotes omitted).

The question remains whether, via an evidentiary hearing, the State might establish a necessary connection between Section 3001(3) and the public interest herein involved. In this context, and at the request of the Court, defendants' counsel has submitted, in affidavit form, an offer of proof requesting an opportunity to call Dr. Anthony E. Terino, Director of the Division of School Supervision of the New York State Department of Education. It is represented that Dr. Terino would testify that 1) teachers are required to convey principles of American citizenship to their students; 2) the function of a teacher is not limited to imparting particular subject matter; the teacher also serves as an example for his students "from which they acquire knowledge and are influenced in the formation of their attitudes and behavior patterns," and 3) aliens who voluntarily refuse naturalization "are not appropriate teachers in a curriculum that requires imparting principles of American citizenship."

In our opinion, the further delay that would be occasioned by an evidentiary hearing would be unjustified. It is inconceivable that defendants could establish, on the basis of the proposed testimony of Dr. Terino, that a broad exclusion of *all* non-applicant aliens from *all* teaching positions is necessary to the advancement of New York's claimed interest.

No doubt teachers and their students may engage in exchanges reaching beyond the scope of a particular course of instruction. Nevertheless, defendants' position that, regardless of his other attributes, the non-applicant alien's voluntary decision to retain his native citizenship necessarily renders him, by example, a negative influence, and thus inherently unqualified to teach, is unsupported by anything in the present record. Nor would such a conclusion be supported by the proposed testimony of Dr. Terino. Indeed, New York's attempt to exclude all non-applicant aliens from its academic community seems repugnant to the very heritage the State is seeking to inculcate. As the Supreme Court recognized, albeit in a somewhat different context, statutes which "cast a pall of orthodoxy over the classroom" are ultimately destructive:

"The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection'." *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (citations omitted).

We conclude that Section 3001(3) is unconstitutional and that its further enforcement must be enjoined.

Plaintiffs' motion for summary judgment is granted.

Submit order on notice.