AMBACH, COMMISSIONER OF EDUCATION OF THE
STATE OF NEW YORK, ET AL. *v.* NORWICK ET AL.

No. 76–808.   Argued January 10, 1979—Decided April 17, 1979

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 81.

*Judith A. Gordon,* Assistant Attorney General of New York, argued the cause for appellants. With her on the briefs were *Robert Abrams,* Attorney General, *Louis J. Lefkowitz,* former Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *George D. Zuckerman,* Assistant Solicitor General.

*Bruce J. Ennis, Jr.,* argued the cause for appellees. With him on the brief were *David Carliner* and *Burt Neuborne.**

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether a State, consistently with the Equal Protection Clause of the Fourteenth Amendment, may refuse to employ as elementary and secondary school teachers aliens who are eligible for United States citizenship but who refuse to seek naturalization.

I

New York Education Law § 3001 (3) (McKinney 1970) forbids certification as a public school teacher of any person who is not a citizen of the United States, unless that person has

---

*Albert E. Arent, Vilma S. Martinez, Peter Roos,* and *Roderic V. O. Boggs* filed a brief for the Washington Lawyers' Committee for Civil Rights Under Law et al. as *amici curiae* urging affirmance.

manifested an intention to apply for citizenship.[1] The Commissioner of Education is authorized to create exemptions from this prohibition, and has done so with respect to aliens who are not yet eligible for citizenship.[2] Unless a teacher obtains certification, he may not work in a public elementary or secondary school in New York.[3]

---

[1] The statute provides:

"No person shall be employed or authorized to teach in the public schools of the state who is:

.        .        .        .        .

"3. Not a citizen. The provisions of this subdivision shall not apply, however, to an alien teacher now or hereafter employed, provided such teacher shall make due application to become a citizen and thereafter within the time prescribed by law shall become a citizen. The provisions of this subdivision shall not apply after July first, nineteen hundred sixty-seven, to an alien teacher employed pursuant to regulations adopted by the commissioner of education permitting such employment." N. Y. Educ. Law § 3001 (3) (McKinney 1970).

The statute contains an exception for persons who are ineligible for United States citizenship solely because of an oversubscribed quota. § 3001-a (McKinney 1970). Because this statutory provision is in all respects narrower than the exception provided by regulation, see n. 2, *infra,* as a practical matter it has no effect.

The State does not certify the qualifications of teachers in the private schools, although it does require that such teachers be "competent." N. Y. Educ. Law § 3204 (2) (McKinney Supp. 1978–1979). Accordingly, we are not presented with the question of, and express no view as to, the permissibility of a citizenship requirement pertaining to teachers in private schools.

[2] The following regulation governs here:

"*Citizenship.* A teacher who is not a citizen of the United States or who has not declared intention of becoming a citizen may be issued a provisional certificate providing such teacher has the appropriate educational qualifications as defined in the regulations and (1) possesses skills or competencies not readily available among teachers holding citizenship, or (2) is unable to declare intention of becoming a citizen for valid statutory reasons." 8 N. Y. C. R. R. § 80.2 (i) (1978).

[3] Certification by the Commissioner of Education is not required of teachers at state institutions of higher education and the citizenship

Appellee Norwick was born in Scotland and is a subject of Great Britain. She has resided in this country since 1965 and is married to a United States citizen. Appellee Dachinger is a Finnish subject who came to this country in 1966 and also is married to a United States citizen. Both Norwick and Dachinger currently meet all of the educational requirements New York has set for certification as a public school teacher, but they consistently have refused to seek citizenship in spite of their eligibility to do so. Norwick applied in 1973 for a teaching certificate covering nursery school through sixth grade, and Dachinger sought a certificate covering the same grades in 1975.[4] Both applications were denied because of appellees' failure to meet the requirements of § 3001 (3). Norwick then filed this suit seeking to enjoin the enforcement of § 3001 (3), and Dachinger obtained leave to intervene as a plaintiff.

A three-judge District Court was convened pursuant to 28 U. S. C. § 2281 (1970 ed.). Applying the "close judicial scrutiny" standard of *Graham* v. *Richardson,* 403 U. S. 365, 372 (1971), the court held that § 3001 (3) discriminated against aliens in violation of the Equal Protection Clause. *Norwick* v. *Nyquist,* 417 F. Supp. 913 (SDNY 1976). The court believed that the statute was overbroad, because it excluded all resident aliens from all teaching jobs regardless of the subject sought to be taught, the alien's nationality, the nature of the

---

restriction accordingly does not apply to them. Brief for Appellants 13 n. *.

[4] At the time of her application Norwick had not yet met the postgraduate educational requirements for a permanent certificate and accordingly applied only for a temporary certificate, which also is governed by § 3001 (3). She since has obtained the necessary graduate degree for full certification. Dachinger previously had obtained a temporary certificate, which had lapsed at the time of her 1975 application. The record does not indicate whether Dachinger previously had declared an intent to obtain citizenship or had obtained the temporary certificate because of some applicable exception to the citizenship requirement.

alien's relationship to this country, and the alien's willingness to substitute some other sign of loyalty to this Nation's political values, such as an oath of allegiance. *Id.,* at 921. We noted probable jurisdiction over the state school officials' appeal, 436 U. S. 902 (1978), and now reverse.

## II

### A

The decisions of this Court regarding the permissibility of statutory classifications involving aliens have not formed an unwavering line over the years. State regulation of the employment of aliens long has been subject to constitutional constraints. In *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886), the Court struck down an ordinance which was applied to prevent aliens from running laundries, and in *Truax* v. *Raich,* 239 U. S. 33 (1915), a law requiring at least 80% of the employees of certain businesses to be citizens was held to be an unconstitutional infringement of an alien's "right to work for a living in the common occupations of the community . . . ." *Id.,* at 41. At the same time, however, the Court also has recognized a greater degree of latitude for the States when aliens were sought to be excluded from public employment. At the time *Truax* was decided, the governing doctrine permitted States to exclude aliens from various activities when the restriction pertained to "the regulation or distribution of the public domain, or of the common property or resources of the people of the State . . . ." *Id.,* at 39. Hence, as part of a larger authority to forbid aliens from owning land, *Frick* v. *Webb,* 263 U. S. 326 (1923); *Webb* v. *O'Brien,* 263 U. S. 313 (1923); *Porterfield* v. *Webb,* 263 U. S. 225 (1923); *Terrace* v. *Thompson,* 263 U. S. 197 (1923); *Blythe* v. *Hinckley,* 180 U. S. 333 (1901); *Hauenstein* v. *Lynham,* 100 U. S. 483 (1880); harvesting wildlife, *Patsone* v. *Pennsylvania,* 232 U. S. 138 (1914); *McCready* v. *Virginia,* 94 U. S. 391 (1877);

or maintaining an inherently dangerous enterprise, *Ohio ex rel. Clarke* v. *Deckebach,* 274 U. S. 392 (1927), States permissibly could exclude aliens from working on public construction projects, *Crane* v. *New York,* 239 U. S. 195 (1915), and, it appears, from engaging in any form of public employment at all, see *Truax, supra,* at 40.

Over time, the Court's decisions gradually have restricted the activities from which States are free to exclude aliens. The first sign that the Court would question the constitutionality of discrimination against aliens even in areas affected with a "public interest" appeared in *Oyama* v. *California,* 332 U. S. 633 (1948). The Court there held that statutory presumptions designed to discourage evasion of California's ban on alien landholding discriminated against the citizen children of aliens. The same Term, the Court held that the "ownership" a State exercises over fish found in its territorial waters "is inadequate to justify California in excluding any or all aliens who are lawful residents of the State from making a living by fishing in the ocean off its shores while permitting all others to do so." *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 421 (1948). This process of withdrawal from the former doctrine culminated in *Graham* v. *Richardson, supra,* which for the first time treated classifications based on alienage as "inherently suspect and subject to close judicial scrutiny." 403 U. S., at 372. Applying *Graham,* this Court has held invalid statutes that prevented aliens from entering a State's classified civil service, *Sugarman* v. *Dougall,* 413 U. S. 634 (1973), practicing law, *In re Griffiths,* 413 U. S. 717 (1973), working as an engineer, *Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976), and receiving state educational benefits, *Nyquist* v. *Mauclet,* 432 U. S. 1 (1977).

Although our more recent decisions have departed substantially from the public-interest doctrine of *Truax's* day, they have not abandoned the general principle that some state functions are so bound up with the operation of the State as

a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government. In *Sugarman,* we recognized that a State could, "in an appropriately defined class of positions, require citizenship as a qualification for office." We went on to observe:

> "Such power inheres in the State by virtue of its obligation, already noted above, 'to preserve the basic conception of a political community.' . . . And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government." 413 U. S., at 647 (citation omitted).

The exclusion of aliens from such governmental positions would not invite as demanding scrutiny from this Court. *Id.,* at 648. See also *Nyquist* v. *Mauclet, supra,* at 11; *Perkins* v. *Smith,* 370 F. Supp. 134 (Md. 1974), summarily aff'd, 426 U. S. 913 (1976).

Applying the rational-basis standard, we held last Term that New York could exclude aliens from the ranks of its police force. *Foley* v. *Connelie,* 435 U. S. 291 (1978). Because the police function fulfilled "a most fundamental obligation of government to its constituency" and by necessity cloaked policemen with substantial discretionary powers, we viewed the police force as being one of those appropriately defined classes of positions for which a citizenship requirement could be imposed. *Id.,* at 297. Accordingly, the State was required to justify its classification only "by a showing of some rational relationship between the interest sought to be protected and the limiting classification." *Id.,* at 296.

The rule for governmental functions, which is an exception to the general standard applicable to classifications based on alienage, rests on important principles inherent in the Constitution. The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State. The Constitution itself refers to the distinction no less than 11 times, see *Sugarman* v. *Dougall, supra,* at 651–652 (REHNQUIST, J., dissenting), indicating that the status of citizenship was meant to have significance in the structure of our government. The assumption of that status, whether by birth or naturalization, denotes an association with the polity which, in a democratic republic, exercises the powers of governance. See *Foley* v. *Connelie, supra,* at 295. The form of this association is important: an oath of allegiance or similar ceremony cannot substitute for the unequivocal legal bond citizenship represents. It is because of this special significance of citizenship that governmental entities, when exercising the functions of government, have wider latitude in limiting the participation of noncitizens.[5]

## B

In determining whether, for purposes of equal protection analysis, teaching in public schools constitutes a governmental function, we look to the role of public education and to the degree of responsibility and discretion teachers possess in fulfilling that role. See *Foley* v. *Connelie, supra,* at 297. Each of these considerations supports the conclusion that public school teachers may be regarded as performing a task "that

---

[5] That the significance of citizenship has constitutional dimensions also has been recognized by several of our decisions. In *Trop* v. *Dulles,* 356 U. S. 86 (1958), a plurality of the Court held that the expatriation of an American citizen constituted cruel and unusual punishment for the crime of desertion in time of war. In *Afroyim* v. *Rusk,* 387 U. S. 253 (1967), the Court held that the Constitution forbade Congress from depriving a person of his citizenship against his will for any reason.

go[es] to the heart of representative government." *Sugar-man* v. *Dougall, supra,* at 647.[6]

Public education, like the police function, "fulfills a most fundamental obligation of government to its constituency." *Foley, supra,* at 297. The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests, long has been recognized by our decisions:

> "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education

---

[6] The dissenting opinion of MR. JUSTICE BLACKMUN, in reaching an opposite conclusion, appears to apply a different analysis from that employed in our prior decisions. Rather than considering whether public school teachers perform a significant government function, the inquiry mandated by *Foley v. Connelie,* 435 U. S. 291 (1978), and *Sugarman* v. *Dougall,* the dissent focuses instead on the general societal importance of primary and secondary school teachers both public and private. Thus, the dissent on the one hand depreciates the importance of New York's citizenship requirement because it is not applied to private school teachers, and on the other hand argues that the role teachers perform in our society is no more significant than that filled by attorneys. This misses the point of *Foley* and *Sugarman.* New York's citizenship requirement is limited to a governmental function because it applies only to teachers employed by and acting as agents of the State. The Connecticut statute held unconstitutional in *In re Griffiths,* 413 U. S. 717 (1973), by contrast, applied to all attorneys, most of whom do not work for the government. The exclusion of aliens from access to the bar implicated the right to pursue a chosen occupation, not access to public employment. Cf. *Nyquist* v. *Mauclet,* 432 U. S. 1, 15–16, n. (1977) (POWELL, J., dissenting). The distinction between a private occupation and a government function was noted expressly in *Griffiths:*

"Lawyers do indeed occupy professional positions of responsibility and influence that impose on them duties correlative with their vital right of access to the courts. Moreover, by virtue of their professional aptitudes and natural interests, lawyers have been leaders in government throughout the history of our country. Yet, they are not officials of government by virtue of being lawyers." 413 U. S., at 729.

both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954).

See also *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189, 246 (1973) (POWELL, J., concurring in part and dissenting in part); *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 29–30 (1973); *Wisconsin* v. *Yoder,* 406 U. S. 205, 213 (1972); *id.,* at 238–239 (WHITE, J., concurring); *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 230 (1963) (BRENNAN, J., concurring); *Adler* v. *Board of Education,* 342 U. S. 485, 493 (1952); *McCollum* v. *Board of Education,* 333 U. S. 203, 212 (1948) (opinion of Frankfurter, J.); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923); *Interstate Consolidated Street R. Co.* v. *Massachusetts,* 207 U. S. 79 (1907).[7] Other authorities have perceived public schools as an "assimilative force" by which diverse and conflicting elements in our society are brought together on a broad but common ground. See, *e. g.,* J. Dewey, Democracy and Education 26 (1929); N. Edwards & H. Richey, The School in the American Social Order 623–624 (2d ed. 1963). These perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists. See R. Daw-

---

[7] As *San Antonio Independent School Dist.* v. *Rodriguez* recognized, there is no inconsistency between our recognition of the vital significance of public education and our holding that access to education is not guaranteed by the Constitution. 411 U. S., at 30–35.

son & K. Prewitt, Political Socialization 146–167 (1969); R. Hess & J. Torney, The Development of Political Attitudes in Children 114, 158–171, 217–220 (1967); V. Key, Public Opinion and American Democracy 323–343 (1961).[8]

Within the public school system, teachers play a critical part in developing students' attitude toward government and understanding of the role of citizens in our society. Alone among employees of the system, teachers are in direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school. In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way the course material is communicated to students. They are responsible for presenting and explaining the subject matter in a way that is both comprehensible and inspiring. No amount of standardization of teaching materials or lesson plans can eliminate the personal qualities a teacher brings to bear in achieving these goals. Further, a teacher serves as a role model for his students, exerting a subtle but important influence over their

---

[8] The curricular requirements of New York's public school system reflect some of the ways a public school system promotes the development of the understanding that is prerequisite to intelligent participation in the democratic process. The schools are required to provide instruction "to promote a spirit of patriotic and civic service and obligation and to foster in the children of the state moral and intellectual qualities which are essential in preparing to meet the obligations of citizenship in peace or in war . . . ." N. Y. Educ. Law § 801 (1) (McKinney 1969). Flag and other patriotic exercises also are prescribed, as loyalty is a characteristic of citizenship essential to the preservation of a country. § 802 (McKinney 1969 and Supp. 1978–1979). In addition, required courses include classes in civics, United States and New York history, and principles of American government. §§ 3204 (3) (a) (1), (2) (McKinney 1970).

Although private schools also are bound by most of these requirements, the State has a stronger interest in ensuring that the schools it most directly controls, and for which it bears the cost, are as effective as possible in teaching these courses.

perceptions and values. Thus, through both the presentation of course materials and the example he sets, a teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities.[9] This influence is crucial to the continued good health of a democracy.[10]

Furthermore, it is clear that all public school teachers, and not just those responsible for teaching the courses most directly related to government, history, and civic duties, should

---

[9] Although the findings of scholars who have written on the subject are not conclusive, they generally reinforce the common-sense judgment, and the experience of most of us, that a teacher exerts considerable influence over the development of fundamental social attitudes in students, including those attitudes which in the broadest sense of the term may be viewed as political. See, *e. g.*, R. Dawson & K. Prewitt, Political Socialization 158–167 (1969); R. Hess & J. Torney, The Development of Political Attitudes in Children 162–163, 217–218 (1967). Cf. Note, Aliens' Right to Teach: Political Socialization and the Public Schools, 85 Yale L. J. 90, 99–104 (1975).

[10] Appellees contend that restriction of an alien's freedom to teach in public schools is contrary to principles of diversity of thought and academic freedom embodied in the First Amendment. See also *id.*, at 106–109. We think that the attempt to draw an analogy between choice of citizenship and political expression or freedom of association is wide of the mark, as the argument would bar any effort by the State to promote particular values and attitudes toward government. Section 3001 (3) does not inhibit appellees from expressing freely their political or social views or from associating with whomever they please. Cf. *Givhan* v. *Western Line Consol. School Dist.*, 439 U. S. 410, 415–416 (1979); *Mt. Healthy City Board of Education* v. *Doyle*, 429 U. S. 274 (1977); *Pickering* v. *Board of Education*, 391 U. S. 563 (1968). Nor are appellees discouraged from joining with others to advance particular political ends. Cf. *Shelton* v. *Tucker*, 364 U. S. 479 (1960). The only asserted liberty of appellees withheld by the New York statute is the opportunity to teach in the State's schools so long as they elect not to become citizens of this country. This is not a liberty that is accorded constitutional protection.

help fulfill the broader function of the public school system.[11] Teachers, regardless of their specialty, may be called upon to teach other subjects, including those expressly dedicated to political and social subjects.[12] More importantly, a State properly may regard all teachers as having an obligation to promote civic virtues and understanding in their classes, regardless of the subject taught. Certainly a State also may take account of a teacher's function as an example for students, which exists independently of particular classroom subjects. In light of the foregoing considerations, we think it clear that public school teachers come well within the "governmental function" principle recognized in *Sugarman* and *Foley*. Accordingly, the Constitution requires only that a citizenship requirement applicable to teaching in the public schools bear a rational relationship to a legitimate state interest. See *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 314 (1976):

## III

As the legitimacy of the State's interest in furthering the educational goals outlined above is undoubted, it remains only to consider whether § 3001 (3) bears a rational relationship to this interest. The restriction is carefully framed to serve its purpose, as it bars from teaching only those aliens who have demonstrated their unwillingness to obtain United States citizenship.[13] Appellees, and aliens similarly situated, in effect have chosen to classify themselves. They prefer to retain citizenship in a foreign country with the obligations it entails

---

[11] At the primary school level, for which both appellees sought certification, teachers are responsible for all of the basic curriculum.

[12] In New York, for example, all certified teachers, including those in the secondary schools, are required to be available for up to five hours of teaching a week in subjects outside their specialty. 8 N. Y. C. R. R. § 80.2 (c) (1978).

[13] See n. 2, *supra*.

of primary duty and loyalty.[14]   They have rejected the open invitation extended to qualify for eligibility to teach by applying for citizenship in this country.   The people of New York, acting through their elected representatives, have made a judgment that citizenship should be a qualification for teaching the young of the State in the public schools, and § 3001 (3) furthers that judgment.[15]

*Reversed.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

Once again the Court is asked to rule upon the constitutionality of one of New York's many statutes that impose a

---

[14] As our cases have emphasized, resident aliens pay taxes, serve in the Armed Forces, and have made significant contributions to our country in private and public endeavors.   See *In re Griffiths,* 413 U. S., at 722; *Sugarman* v. *Dougall,* 413 U. S., at 645; *Graham* v. *Richardson,* 403 U. S. 365, 376 (1971).   No doubt many of them, and we do not exclude appellees, would make excellent public school teachers.   But the legislature, having in mind the importance of education to state and local governments, see *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954), may determine eligibility for the key position in discharging that function on the assumption that *generally* persons who are citizens, or who have not declined the opportunity to seek United States citizenship, are better qualified than are those who have elected to remain aliens.´   We note in this connection that regulations promulgated pursuant to § 3001 (3) do provide for situations where a particular alien's special qualifications as a teacher outweigh the policy primarily served by the statute.   See 8 N. Y. C. R. R. § 80.2 (i)(1) (1978).   The appellants inform us, however, that the authority conferred by this regulation has not been exercised.   Brief for Appellants 7 n. *.

[15] Appellees argue that the State cannot rationally exclude aliens from teaching positions and yet permit them to vote for and sit on certain local school boards.   We note, first, that the State's legislature has not expressly endorsed this policy.   Rather, appellants as an administrative matter have interpreted the statute governing New York City's unique community school boards, N. Y. Educ. Law § 2590-c (4) (McKinney Supp. 1978–1979), to permit aliens who are the parents of public school students

requirement of citizenship upon a person before that person may earn his living in a specified occupation.[1] These New York statutes, for the most part, have their origin in the frantic and overreactive days of the First World War when attitudes of parochialism and fear of the foreigner were the order of the day. This time we are concerned with the right to teach in the public schools of the State, at the elementary and secondary levels, and with the citizenship requirement that N. Y. Educ. Law § 3001 (3) (McKinney 1970), quoted by the Court, *ante*, at 70 n. 1, imposes.[2]

As the Court acknowledges, *ante*, at 72, its decisions regarding the permissibility of statutory classifications concerning aliens "have not formed an unwavering line over the years." [3] Thus, just last Term, in *Foley* v. *Connelie*, 435 U. S. 291 (1978), the Court upheld against equal protection challenge the New York statute limiting appointment of members of the state police force to citizens of the United States. The touchstone, the Court indicated, was that citizenship may be

---

to participate in these boards. See App. 27, 29. We also may assume, without having to decide, that there is a rational basis for a distinction between teachers and board members based on their respective responsibilities. Although possessing substantial responsibility for the administration of the schools, board members teach no classes, and rarely if ever are known or identified by the students.

[1] One of the appellees in *Nyquist* v. *Mauclet*, 432 U. S. 1 (1977), submitted a list of the New York statutes that required citizenship, or a declaration of intent to become a citizen, for no fewer than 37 occupations. Brief for Appellee Mauclet, O. T. 1976, No. 76–208, pp. 19–22, nn. 8–44, inclusive. Some of those statutes have been legislatively repealed or modified, or judicially invalidated. Others are still in effect. Among the latter are those relating to the occupations of inspector, certified shorthand reporter, funeral director, masseur, physical therapist, and animal technician.

[2] This particular citizenship requirement had its origin in 1918 N. Y. Laws, ch. 158, effective Apr. 4, 1918.

[3] "To be sure, the course of decisions protecting the employment rights of resident aliens has not been an unswerving one." *In re Griffiths*, 413 U. S. 717, 720 (1973).

a relevant qualification for fulfilling " 'important nonelective executive, legislative, and judicial positions' held by 'officers who participate directly in the formulation, execution, or review of broad public policy.' "  *Id.*, at 296, quoting *Sugarman* v. *Dougall*, 413 U. S. 634, 647 (1973). For such positions, a State need show only some rational relationship between the interest sought to be protected and the limiting classification. Police, it then was felt, were clothed with authority to exercise an almost infinite variety of discretionary powers that could seriously affect members of the public. 435 U. S., at 297. They thus fell within the category of important officers who participate directly in the execution of "broad public policy." The Court was persuaded that citizenship bore a rational relationship to the special demands of police positions, and that a State therefore could constitutionally confine that public responsibility to citizens of the United States. *Id.*, at 300. The propriety of making citizenship a qualification for a narrowly defined class of positions was also recognized, in passing, in *Sugarman* v. *Dougall*, 413 U. S., at 647, and in *Nyquist* v. *Mauclet*, 432 U. S. 1, 11 (1977).

On the other hand, the Court frequently has invalidated a state provision that denies a resident alien the right to engage in specified occupational activity: *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886) (ordinance applied so as to prevent Chinese subjects from engaging in the laundry business); *Truax* v. *Raich*, 239 U. S. 33 (1915) (statute requiring an employer's work force to be composed of not less than 80% "qualified electors or native-born citizens"); *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410 (1948) (limitation of commercial fishing licenses to persons not "ineligible to citizenship"); *Sugarman* v. *Dougall, supra* (New York statute relating to permanent positions in the "competitive class" of the state civil service); *In re Griffiths*, 413 U. S. 717 (1973) (the practice of law); *Nelson* v. *Miranda*, 413 U. S. 902 (1973), summarily aff'g 351 F. Supp. 735 (Ariz. 1972) (social service worker

and teacher); *Examining Board* v. *Flores de Otero,* 426 U. S. 572 (1976) (the practice of civil engineering). See also *Nyquist* v. *Mauclet, supra* (New York statute barring certain resident aliens from state financial assistance for higher education).

Indeed, the Court has held more than once that state classifications based on alienage are "inherently suspect and subject to close judicial scrutiny." *Graham* v. *Richardson,* 403 U. S. 365, 372 (1971). See *Examining Board* v. *Flores de Otero,* 426 U. S., at 601–602; *In re Griffiths,* 413 U. S., at 721; *Sugarman* v. *Dougall,* 413 U. S., at 642; *Nyquist* v. *Mauclet,* 432 U. S., at 7. And "[a]lienage classifications by a State that do not withstand this stringent examination cannot stand." *Ibid.*

There is thus a line, most recently recognized in *Foley* v. *Connelie,* between those employments that a State in its wisdom constitutionally may restrict to United States citizens, on the one hand, and those employments, on the other, that the State may not deny to resident aliens. For me, the present case falls on the *Sugarman-Griffiths-Flores de Otero-Mauclet* side of that line, rather than on the narrowly isolated *Foley* side.

We are concerned here with elementary and secondary education in the public schools of New York State. We are not concerned with teaching at the college or graduate levels. It seems constitutionally absurd, to say the least, that in these lower levels of public education a Frenchman may not teach French or, indeed, an Englishwoman may not teach the grammar of the English language. The appellees, to be sure, are resident "aliens" in the technical sense, but there is not a word in the record that either appellee does not have roots in this country or is unqualified in any way, other than the imposed requirement of citizenship, to teach. Both appellee Norwick and appellee Dachinger have been in this country for

over 12 years. Each is married to a United States citizen. Each currently meets all the requirements, other than citizenship, that New York has specified for certification as a public school teacher. Tr. of Oral Arg. 4.[4] Each is willing, if required, to subscribe to an oath to support the Constitutions of the United States and of New York.[5] Each lives in an American community, must obey its laws, and must pay all of the taxes citizens are obligated to pay. Appellees, however, have hesitated to give up their respective British and Finnish citizenships, just as lawyer Fre Le Poole Griffiths, the subject of *In re Griffiths, supra,* hesitated to renounce her Netherlands citizenship, although married to a citizen of the United States and a resident of Connecticut.

But the Court, to the disadvantage of appellees, crosses the line from *Griffiths* to *Foley* by saying, *ante,* at 75, that the "distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State." It then concludes that public school teaching "constitutes a governmental function," *ibid.,* and that public school teachers may be regarded as performing a task that goes "to the heart of representative government." *Ante,* at 76. The Court speaks of the importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which

---

[4] Appellee Norwick is a *summa cum laude* graduate of a Massachusetts college and received an A average in full-time graduate work in the State University of New York at Albany. She has taught both in this country and in Great Britain.

Appellee Dachinger is a *cum laude* graduate, with a major in German, of Lehman College, a unit of the City University of New York, and possesses a master's degree in Early Childhood Education from that institution. She has taught at a day-care center in the Bronx.

Each appellee, thus, has received and excelled in educational training the State of New York itself offers.

[5] See *In re Griffiths,* 413 U. S., at 726 n. 18.

our society rests.[6]  After then observing that teachers play a critical part in all this, the Court holds that New York's citizenship requirement is constitutional because it bears a rational relationship to the State's interest in furthering these educational goals.

I perceive a number of difficulties along the easy road the Court takes to this conclusion:

First, the New York statutory structure itself refutes the argument.  Section 3001 (3), the very statute at issue here, provides for exceptions with respect to alien teachers "employed pursuant to regulations adopted by the commissioner of education permitting such employment."  Section 3001–a (McKinney 1970) provides another exception for persons ineligible for United States citizenship because of oversubscribed quotas.  Also, New York is unconcerned with any citizenship qualification for teachers in the private schools of the State, even though the record indicates that about 18% of the pupils at the elementary and secondary levels attend private schools. The education of those pupils seems not to be inculcated with something less than what is desirable for citizenship and what the Court calls an influence "crucial to the continued good health of a democracy."  *Ante,* at 79.  The State apparently, under § 3001 (3), would not hesitate to employ an alien teacher while he waits to attain citizenship, even though he may fail ever to attain it.  And the stark fact that the State permits some aliens to sit on certain local school boards, N. Y. Educ. Law § 2590–c (4) (McKinney Supp. 1978–1979), reveals how shallow and indistinct is New York's line of demarcation between citizenship and noncitizenship.  The Court's at-

---

[6] One, of course, can agree with this observation.  One may concede, also, that public schools are an " 'assimilative force' by which diverse and conflicting elements in our society are brought together on a broad but common ground," *ante,* at 77, and that the inculcation of fundamental values by our public schools is necessary to the maintenance of a democratic political system.

tempted rationalization of this fact, *ante,* at 81–82, n. 15, hardly extinguishes the influence school board members, including these otherwise "disqualified" resident aliens, possess in school administration, in the selection of faculty, and in the approval of textbooks and instructional materials.

Second, the New York statute is all-inclusive in its disqualifying provisions: "No person shall be employed or authorized to teach in the public schools of the state who is . . . [n]ot a citizen." It sweeps indiscriminately. It is "neither narrowly confined nor precise in its application," nor limited to the accomplishment of substantial state interests. *Sugarman* v. *Dougall,* 413 U. S., at 643. See Note, Aliens' Right to Teach: Political Socialization and the Public Schools, 85 Yale L. J. 90, 109–111 (1975).

Third, the New York classification is irrational. Is it better to employ a poor citizen teacher than an excellent resident alien teacher? Is it preferable to have a citizen who has never seen Spain or a Latin American country teach Spanish to eighth graders and to deny that opportunity to a resident alien who may have lived for 20 years in the culture of Spain or Latin America? The State will know how to select its teachers responsibly, wholly apart from citizenship, and can do so selectively and intelligently.[7] That is the way to

---

[7] In *In re Griffiths* the Court significantly has observed:

"Connecticut has wide freedom to gauge on a case-by-case basis the fitness of an applicant to practice law. Connecticut can, and does, require appropriate training and familiarity with Connecticut law. Apart from such tests of competence, it requires a new lawyer to take both an 'attorney's oath' to perform his functions faithfully and honestly and a 'commissioner's oath' to 'support the constitution of the United States, and the constitution of the state of Connecticut.' Appellant has indicated her willingness and ability to subscribe to the substance of both oaths, and Connecticut may quite properly conduct a character investigation to insure in any given case 'that an applicant is not one who "swears to an oath *pro forma* while declaring or manifesting his disagreement with or indifference to the oath." *Bond* v. *Floyd,* 385 U. S. 116, 132.' *Law Students*

accomplish the desired result. An artificial citizenship bar is not a rational way. It is, instead, a stultifying provision. The route to "diverse and conflicting elements" and their being "brought together on a broad but common ground," which the Court so emphasizes, *ante,* at 77, is hardly to be achieved by disregarding some of the diverse elements that are available, competent, and contributory to the richness of our society and of the education it could provide.

Fourth, it is logically impossible to differentiate between this case concerning teachers and *In re Griffiths* concerning attorneys. If a resident alien *may not* constitutionally be barred from taking a state bar examination and thereby becoming qualified to practice law in the courts of a State, how is one to comprehend why a resident alien *may* constitutionally be barred from teaching in the elementary and secondary levels of a State's public schools? One may speak proudly of the role model of the teacher, of his ability to mold young minds, of his inculcating force as to national ideals, and of his profound influence in the impartation of our society's values. Are the attributes of an attorney any the less? He represents us in our critical courtroom controversies even when citizenship and loyalty may be questioned. He stands as an officer of every court in which he practices. He is responsible for strict adherence to the announced and implied standards of professional conduct and to the requirements of evolving ethical codes, and for honesty and integrity in his professional

---

*Research Council* v. *Wadmond,* 401 U. S., at 164. Moreover, once admitted to the bar, lawyers are subject to continuing scrutiny by the organized bar and the courts. In addition to discipline for unprofessional conduct, the range of post-admission sanctions extends from judgments for contempt to criminal prosecutions and disbarment. In sum, the Committee simply has not established that it must exclude all aliens from the practice of law in order to vindicate its undoubted interest in high professional standards." 413 U. S., at 725–727 (footnotes omitted).

and personal life. Despite the almost continuous criticism leveled at the legal profession, he, too, is an influence in legislation, in the community, and in the role-model figure that the professional person enjoys.[8] The Court specifically recognized this in *In re Griffiths:*

> "Lawyers do indeed occupy professional positions of responsibility and influence. that impose on them duties correlative with their vital right of access to the courts. Moreover, by virtue of their professional aptitudes and natural interests, lawyers have been leaders in government throughout the history of our country." 413 U. S., at 729.[9]

If an attorney has a constitutional right to take a bar examination and practice law, despite his being a resident alien, it is impossible for me to see why a resident alien, otherwise completely competent and qualified, as these appellees concededly are, is constitutionally disqualified from teaching in the public schools of the great State of New York. The

---

[8] See also *Stockton* v. *Ford,* 11 How. 232, 247 (1851); *Hickman* v. *Taylor,* 329 U. S. 495, 514–515 (1947) (concurring opinion); *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 247 (1957) (concurring opinion); *In re Sawyer,* 360 U. S. 622, 668 (1959) (dissenting opinion); J. Story, Miscellaneous Writings, Value and Importance of Legal Studies 503–549 (W. Story ed. 1972); Stone, The Public Influence of the Bar, 48 Harv. L. Rev. 1 (1934); W. Brennan, The Responsibilities of the Legal Profession, Address before the Law School of Harvard University (1967); A. de Tocqueville, Democracy in America 321–331 (Schocken ed. 1961); J. Rogers, The Lawyer in American Public Life, in Morrison Foundation Lectures 41, 61 (1940).

[9] In order to keep attorneys on the nongovernmental side of the classification line, the Court continued:

"Yet, they are not officials of government by virtue of being lawyers. Nor does the status of holding a license to practice law place one so close to the core of the political process as to make him a formulator of government policy." 413 U. S., at 729.

District Court expressed it well and forcefully when it observed that New York's exclusion "seems repugnant to the very heritage the State is seeking to inculcate." *Norwick* v. *Nyquist*, 417 F. Supp. 913, 922 (SDNY 1976).

I respectfully dissent.