Jeimy GEBIN, Vicente Crisologo, Christina Robertson, Lay Kheng, Erlinda Valencia, et al., Plaintiffs,

v.

Norman Y. MINETA, in his official capacity as Secretary of the United States Department of Transportation; et al., Defendants.

No. CV02–0493RMTEX.

United States District Court,
C.D. California,
Western Division.

Nov. 12, 2002.

Antonia Hernandez, Hector O. Villagra, Belinda Anne Escobosa, Mexican American Legal Defense & Education Fund, Los Angeles, CA, Alan L. Schlosser, Jayashri Srikantiah, ACLU Foundation of Northern California, San Francisco, CA, Benjamin E. Wizner, ACLU Foundation of Southern California, Los Angeles, CA, Philip Hwang, Lawyers' Committee for Civil Rights of the San Francisco Bay, San Francisco, CA, Robert Rubin, San Francisco Lawyers Committee for Civil Rights, San Francisco, CA, Julie A. Su, Asian Pacific American Legal Center of Southern California, Los Angeles, CA, Erwin Chemerinsky, USC Law School, Los Angeles, CA, Judith A. Scott, Orrin Baird Service Employees International Union, Washington, DC, Steven R. Shapiro, American Civil Liberties Union, New York, NY, Lucas Guttentag, American Civil Liberties Union Foundation, Oakland, CA, Jordan Charles Budd, ACLU Foundation of San Diego and Imperial Counties, San Diego, CA, Rodel E. Rodis, National Federation of Filipino American Associations, San Francisco, CA, Vincent A. Eng, National Asian Pacific AmericanLegal Consortium, Washington, DC, Mark D. Rosenbaum, American Civil Liberties Union of Southern California, Los Angeles, CA, for Plaintiffs.

Roger E. West, AUSA, Office of U.S. Attorney Civil Division, Los Angeles, CA, for Defendants.

## ORDER DENYING MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

TAKASUGI, District Judge.

In the aftermath of the terrorist attacks of September 11, 2001, the Aviation and Transportation Security Act ("ATSA") was signed into law on November 19, 2001, with the stated purpose to "improve aviation security." The ATSA, *inter alia*, provides for federal control of airport screening of passengers and Section 111 thereof adds a new employment requirement for airport screeners: United States citizenship.

According to their complaint, Plaintiffs Jeimy Gebin, Vicente Crisologo, Christina Robertson, Lay Kheng Tan, Erlinda Valencia, Ruperta Gonzalas Boja, Alba Reyes, Eleanor Miranda and Pablo Domin-

guez, eight lawful permanent residents and one U.S. national from American Samoa, have been employed as airport screeners and, but for implementation of Section 111, would be eligible to apply for continuing employment as federal screeners. Plaintiffs bring this action against Norman Y. Mineta, in his official capacity as Secretary of the United States Department of Transportation, and John W. Magaw, in his official capacity as Under Secretary of Transportation for Security, seeking declaratory and injunctive relief challenging Section 111 of the ATSA as a violation of their rights to equal protection of law as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution. Plaintiffs contend that this provision unconstitutionally deprives them and thousands of other lawful permanent residents and U.S. nationals of the opportunity to seek employment as federal security screeners while non-citizens may continue to work in numerous other security-sensitive jobs within our airports—as pilots, flight attendants, baggage handlers, mechanics, cargo loaders, plane cleaners, janitors, food concessionaires, fuellers, cargo deliverers, drivers, guards, and even members of the National Guard, which, after September 11, now performs armed security duties at screening stations side by side with non-citizen screeners whose employment will be terminated by the ATSA. (Plaintiff's Opposition to Defendants' Motion to Dismiss, at 1.)

This matter now comes before the court on the motion by defendants to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The issue before the court, therefore, is whether Congress may constitutionally require United States citizenship as a precondition to employment as a federal airport security screener.

■ Since the Supreme Court decided *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the general rule has been that government action must meet "strict scrutiny" to constitutionally justify the exclusion of aliens. Although *Graham* was a Fourteenth Amendment case; as a general rule, the equal protection analysis as applied to the federal government under the due process clause of the Fifth Amendment is the same. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 217, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). However, there are exceptions to this general rule: (1) the governmental function exception and (2) the special deference to the political branches of the federal government in the area of immigration and naturalization.

## GOVERNMENTAL FUNCTION EXCEPTION

■ "Governmental function" is an exception under which government action discriminating against aliens would warrant a rational basis scrutiny rather than the general rule of strict scrutiny.

'[E]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen.' Such power inheres in the State by virtue of its obligation ... 'to preserve the basic conception of a political community.' And this power and responsibility of the State applies, not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government.

\*   \*   \*   \*   \*   \*

[O]ur scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives. This is no more than a

recognition of a State's historical power to exclude aliens from participation in its democratic political institutions, and a recognition of a State's constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders. *Sugarman v. Dougall,* 413 U.S. 634, 647–48, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (citations omitted).

> [This] rule ... rests on important principles inherent in the Constitution. The distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a State.... It is because of this special significance of citizenship that governmental entities, when exercising the functions of government, have wider latitude in limiting the participation of noncitizens.

*Ambach v. Norwick,* 441 U.S. 68, 75, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (citations omitted.)

In *Sugarman,* the Supreme Court held that New York's law requiring U.S. citizenship for employment as a civil servant in the competitive class was subject to the strict scrutiny test. Addressing appellants contention that "[t]he civil servant 'participates directly in the formulation and execution of government policy,' and thus must be free of competing obligations to another power," 413 U.S. 634, 641, 93 S.Ct. 2842 (citation omitted), the Court explained:

> [A]ppellants' asserted justification proves both too much and too little.... [T]he State's broad prohibition of the employment of aliens applies to many positions with respect to which the State's proffered justification has little, if any, relationship. At the same time, the prohibition has no application at all to positions that would seem naturally to fall within the State's asserted purpose.

Our standard of review of statutes that treat aliens differently from citizens requires a greater degree of precision.

In *Graham v. Richardson,* 403 U.S., at 372, 91 S.Ct. 1848, we observed that aliens as a class "are a prime example of a 'discrete and insular' minority ...," and that classifications based on alienage are "subject to close judicial scrutiny." And as long as a quarter century ago we held that the State's power "to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits." *Takahashi v. Fish Comm'n,* 334 U.S., at 420, 68 S.Ct. 1138. We therefore look to the substantiality of the State's interest in enforcing the statute in question, and to the narrowness of the limits within which the discrimination is confined.

Applying this standard to New York's purpose ..., [the statute in question] does not withstand the necessary close scrutiny.

*Id.* at 642, 93 S.Ct. 2842.

In *Foley v. Connelie,* the Supreme Court was faced with an equal protection challenge to New York's statute limiting the appointment of members of its police force to United States citizens. In determining whether the police serve that governmental function, it was the extent of the discretionary authority vested in police officers that caused the Court to conclude that the citizenship limitation need only "some rational relationship between the interest sought to be protected and the limiting classification." 435 U.S. at 296, 98 S.Ct. 1067. The Supreme Court noted that

> [t]he police function fulfills a most fundamental obligation of government to its constituency. Police officers in the ranks do not formulate policy, *per se,* but they are clothed with authority to

exercise an almost infinite variety of discretionary powers.

*    *    *    *    *    *

Clearly the exercise of police authority calls for a very high degree of judgment and discretion, the abuse or misuse of which can have serious impact on individuals. The office of a policeman is in no sense one of "the common occupations of the community" that the then Mr. Justice Hughes referred to in *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915). A policeman vested with the plenary discretionary powers we have described is not to be equated with a private person engaged in routine public employment or other "common occupations of the community" who exercises no broad power over people generally.

435 U.S. at 297—299, 98 S.Ct. 1067.

The Supreme Court revisited this issue in 1979 when, in *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49, it held that public school teachers serve a governmental function and, therefore, exclusion based on alienage was subject to the liberal rational basis test. The court stated as follows:

> In determining whether, for purposes of equal protection analysis, teaching in public schools constitutes a governmental function, we look to the role of public education and to the degree of responsibility and discretion teachers possess in fulfilling that role. Each of these considerations supports the conclusion that public school teachers may be regarded as performing a task 'that go[es] to the heart of representative government.'
>
> Public education, like the police function, 'fulfills a most fundamental obligation of government to its constituency.' The importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society

rests, long has been recognized by our decisions . . . .

*Id.* at 75—76, 99 S.Ct. 1589 (alteration in original) (citations omitted).

▮▮▮ Unlike police officers and teachers, airport screeners are not vested with discretionary authority, nor do they perform a fundamental obligation of government to its constituency. Instead, the office of an airport screener is more a common occupation of the community. As such, the deference paid in recognition of the wider latitude allowed governmental entities when exercising the functions of government has no application here.

### DEFERENCE TO FEDERAL AUTHORITY

▮▮▮ In the area of immigration and naturalization, the courts recognize a special deference to the political branches of the federal government warranting the application of the relaxed rational basis standard of review. *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). The government contends that this special deference applies in the instant action. However, none of the authority upon which the government relies involved an exclusion of United States nationals, as is the case here. Moreover, the exclusion of United States nationals certainly cannot be considered within the area of immigration and naturalization.

In *Mathews,* the Supreme Court considered congressional action to be within the area of immigration and naturalization when Congress required permanent resident aliens to have resided in the United States for five years to qualify for a medicare supplemental insurance program. In contrast, Section 111 of the ATSA does not merely impose a residency requirement. Instead, it is a wholesale exclusion of all aliens and United States nationals. While it may be reasonable to allow Congress to

impose a residency requirement on permanent resident aliens in the exercise of its immigration and naturalization authority, it is quite another matter to justify an absolute ban of all aliens and U.S. nationals.

Similarly, in *Mow Sun Wong v. Campbell*, 626 F.2d 739 (9th Cir.1980), the Ninth Circuit deferred to an Executive Order of the President which issued specifically to reverse a prior Supreme Court ruling that would have changed a long standing federal policy of excluding aliens from the federal civil service. The Executive Order required federal civil service applicants to be citizens or nationals of the United States. The Ninth Circuit held that the federal interest in encouraging naturalization by aliens in this country was sufficient reason to uphold the constitutionality of the Executive Order.

■ In contrast to the congressional action in question in *Mathews v. Diaz* and the Executive Order that was the subject of *Mow Sun Wong v. Campbell*, neither of which excluded United States nationals, Section 111 of the ATSA excludes all aliens and United States nationals. Such exclusion cannot be construed as an exercise of Congress' authority in the area of immigration and naturalization. The justification for deference in the area of immigration and naturalization is that "decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary. ..." *Mathews v. Diaz*, 426 U.S. at 81, 96 S.Ct. 1883. Justification can also be found in the federal interest in providing an incentive for aliens to be naturalized. *Mow Sun Wong v. Campbell*, 626 F.2d at 745. Clearly, it cannot be said that the exclusion of United States nationals is an exercise of immigration or naturalization authority. It could have no implication in our relations with foreign powers, nor could it be justified as encouraging aliens to naturalize.

The deference paid in recognition of federal legislative authority in the area of immigration and naturalization has no application here.

## APPLICATION OF STRICT SCRUTINY TEST

■ Having determined that the governmental function exception and the deference to congressional authority in the area of immigration and naturalization do not apply, this exclusion of all non-citizens can pass constitutional muster "only if [it is a] narrowly tailored measure[ ] that further[s] compelling governmental interests." *Adarand*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158.

Although improving aviation security is a compelling governmental interest, this court cannot conclude, at this pleading stage, that this categorical exclusion of all non-citizens from employment as screeners is the least restrictive means to further such governmental interest.

As such, this court cannot conclude that plaintiffs' complaint fails to state a claim. Accordingly,

IT IS ORDERED that the motion by defendants to dismiss for failure to state a claim is denied.