**Donald R. CRITES and Shirley D. Crites; Paul E. Williams and Claudia Lynn Williams, Randy Meadors and Deborah Meadors, Plaintiffs–Appellants,**

v.

**Charles E. SMITH, in his official capacity as Commissioner of the Tennessee State Department of Education, and Charles W. Burson, in his official capacity as Attorney General and Reporter of the State of Tennessee, Defendants–Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Sept. 4, 1991.

Application for Permission to Appeal Denied by Supreme Court Feb. 24, 1992.

Larry L. Crain, Ames, Crain & Long, Brentwood, for plaintiffs-appellants.

Michael J. Farris, Home School Legal Defense Assoc., Paeonian Springs, Va., for plaintiffs-appellants pro hac vice.

Charles W. Burson, Atty. Gen. and Reporter, John Knox Walkup, Sol. Gen., Michael W. Catalano, Deputy Atty. Gen., Elizabeth G. Rasmussen, Asst. Atty. Gen., Nashville, for defendants-appellees.

## OPINION

TODD, Presiding Judge.

This suit is brought under the authority of Section 1983 of Title 42 of the United States Code which provides for proceedings for redress for deprivation of "rights, privileges, or immunities secured by the Constitution and laws".

The plaintiffs are parents who desire to teach their children at home rather than to send them to a public or private school for instruction. T.C.A. § 49–6–3050(b) provides that a parent-teacher conducting a home school must comply with certain requirements, including:

Notice to the local superintendent by August 1 before the commencement of each school year of his intent to conduct a "home school" and, for the purpose of reporting only, submit the name, number, age and grade level of children involved, the location of the school, the curriculum to be offered and the proposed hours of instruction and the qualifications of the parent-teacher relative to subdivision (b)(4) or (b)(7). Information contained in such reports may be used only for record keeping and other purposes for which similar information on public school students may be used in accordance with guidelines, rules and regulations of the state board of education;

. . . .

Possession of at least a baccalaureate degree awarded by a college or university accredited by an accrediting agency or association recognized by the state board of education, by a parent-teacher conducting classes in grades nine (9) through twelve (12). A parent-teacher may request an exemption from this requirement from the department of education on a year-to-year basis;

Four of the plaintiffs lack the required degree, and each was denied an exemption from the degree requirement. Two were denied a variation of the August 1 deadline for reporting.

The complaint seeks designation as a class action, a declaration that the "practices and policies" of the "defendants" are unconstitutional and in violation of civil rights, and injunctive relief.

After a hearing on the merits, the Trial Judge, sitting without a jury, dismissed the suit. Plaintiffs have appealed and presented the following issues for review:

1. Whether the Trial Court erred in its finding that the Commissioner's blanket denial of all requests for statutory waivers of the baccalaureate degree requirement is not arbitrary and capricious and unconstitutional.

2. Whether the Trial Court erred in its finding that the Commissioner's rigid enforcement of the August 1 deadline does not result in a denial of the right to travel and violates the standards of equal protection.

3. Whether the Trial Court erred in refusing to certify as two classes of plaintiffs those requesting waivers from the Bachelor's degree requirement, and those seeking relief from the August 1 notification requirement.

4. Whether the Court erred in failing to issue a preliminary and permanent injunction against the arbitrary, capricious and unconstitutional practices of the Commissioner.

Appellants assert that the defendant-Commissioner has a practice and policy of denying all requests for exemption from the degree requirement of the statute and that this practice and policy is arbitrary, capricious and unconstitutional.

The factual background is found in the testimony of Mrs. Betty Long, Administrator of Home Schooling, and the Commissioner. Mrs. Long testified:

Q. Mrs. Long, is there a uniform policy established by the Department of Education on how you treat requests for waivers?

A. No, not established by the Department of Education, no.

Q. Established by the Commission (sic)?

A. I have been directed by the Commissioner to read the letters, yes; and to look at the materials, yes; and to draft a response for him. That is the uniform policy.

Q. Has he told you, given you any kind of uniform direction as to what substance should be put into the response?

A. I recommend to him and then he decides when he reads the letter whether to sign it.

Q. Has he told you how to treat such cases or—strike that. How has he told you to treat such cases?

A. Well, when he first came he was not familiar with the law, and so I met with him and I explained to him the law. And I told him the way that we had handled the waivers under Commissioner McElrath.

Q. What did you tell him?

A. I told him we had so far not granted any up to that point in time.

Q. Was his curiosity piqued and did he ask you why?

A. He asked why, and I said, "Well, we have up to this point—we have not found anyone that we felt really met the requirements equivalent to a baccalaureate degree."

Q. And what did he tell you to do then?

A. He told me to continue the way that I had been doing it, and he would review each one of them, which he has done.

. . . .

Q. Is there a uniform policy to deny them all because there are no standards or guidelines, or are you subjectively reviewing each one? Which one is the truth?

. . . .

A. The policy is they are reviewed and since there are no standards, in the absence of anything equivalent to any experience or educational experience or other experience equivalent to a baccalaureate degree, they have been denied.

Q. You have no standards for judging what an equivalent is, do you?

A. There are no standards by which to either grant them or deny them. They have not been set in writing.

Q. Are there any standards of assessing what is an equivalent?

A. There are no standards that have been set, that is true, but I can only review them and recommend to the Commissioner—

Q. All right, so you're telling us today that there's a—that each piece of paper gets looked at and is reviewed in that sense, but the outcome is always the same because you have no standards?

A. The outcome has been the same because we have not found any that we feel to this point are equivalent to a baccalaureate degree.

The Commissioner testified:

Q. The manner of practice, as you testified, is that when a letter comes in it is routed by you to Ms. Long, as the designated person to handle these requests. . . .

A. Yes.

Q. And then would you agree—this is her statement—"As far as the Commissioner has advised me, he is not granting any exemptions from this requirement"; is that accurate?

A. We have not granted any exemptions, right.

Q. My question is, Commissioner, whether you ever advised Ms. Long to that effect?

A. I would say that would be yes.

Q. It's been the policy, in fact, of the office—of the Department, rather, to use a letter that is somewhat a standard letter—we'll get into those in a moment—but the letter used to deny these requests is from a standard letter; is that not true?

A. I wouldn't say the language was identical, but the essence of the message would be essentially the same.

. . . .

A. Well, let me state it another way to maybe make it clear. My position would be, I think, very similar to that of Commissioner McElrath; that is, that we do not feel that it's unreasonable to require a baccalaureate degree, number one, for someone who is going to be teaching at the high school level; and number two, that to our minds there is not an alternative that we know of to the baccalaureate that would be equivalent to it in the context of the law.

Q. So no matter what degree of educational attainment or experience that a person might obtain informally, that, in your opinion, would not be a suitable substitute to a formal baccalaureate?

A. We have not seen any presentation of anything we would consider to be the equivalent. Let me say I have not, and I would assume he had not; I can't speak for him.

. . . .

Q. What has been now marked as Exhibit 2, Commissioner Smith, specifically I'm referring to the language, and I quote, "Since Tennessee's Home School statute requires a baccalaureate degree for parents conducting home schools for their children in grades nine through twelve and does not provide any standards for granting an exemption to this requirement, I am declining your request." Are you familiar with that language?

A. Uh-huh.

Q. Is it fair to say that language or paraphrasing of that language appears in virtually all the letters declining?

A. They would be language very similar to that if not identical.

. . . .

Q. And what in your mind would be equivalent to a baccalaureate degree?

A. Once again, I'm not sure about that because we haven't seen anything at this point.

Q. No, ma'am. I'm not asking have you seen one yet that measures up to that standard. I'm asking you what the standard is and how you would measure against it.

A. You're asking me to set standards. I do not set the standards. I can't answer that. I don't set the standards.

Q. Who does set the standards?

A. We don't have any standards. We look for something that we feel might be equivalent education-wise, experience-wise that possibly might be the equivalent. I cannot say to you that it would be X, Y or Z because I haven't seen it yet. We haven't determined that yet.

Q. Would you know it if you saw it?

A. I can't answer that either because I haven't done it yet.

■ The evidence does not support the assertion that the Commissioner has a policy of denying all requests for exemption from the degree requirement. However, it does appear that no exemption has been granted, and the policy of the Commissioner is to consider each application separately but to reject each application which does not demonstrate preparation for teaching equivalent to a baccalaureate degree. The Commissioner did not admit that it would be impossible to satisfy him as to equivalency, but he declined to theorize the elements which would, in his opinion, establish equivalency.

It is clear that the action of the General Assembly, in legislating that "a parent-teacher *may* request an exemption from the Department of Education" without providing any express direction or standards for responding to such requests, has placed both the applicants and the Commissioner in a difficult position.

■ Appellants assert that the Legislature has delegated to the Commissioner clear authority to adopt regulations necessary for the implementation of the Home School Law, citing T.C.A. § 49–1–201(a) which states:

**Powers and duties of commissioner.**—(a) The commissioner shall be responsible for the implementation of law or policies established by the general assembly or the state board of education.

The Commissioner has interpreted the statute to express a legislative policy of requiring a baccalaureate degree or its equivalent, and is following that policy by granting no exception unless equivalency is shown. He has complied with the quoted statute, and the courts are not empowered to require him to do more in the way of defining equivalency. The equivalence of the qualification of applicants must be decided on a case-by-case basis. Any review of the decisions of the Commissioner must be on a case-by-case basis, rather than by judicial dictation of the manner in which the Commissioner sees fit to implement the statute.

■ No authority is cited to support a holding that a bare statutory provision that an exception *may* be requested is a mandate to the administering authority to

adopt and publish conditions which would require the request to be granted.

The Commissioner has recognized and applied one general standard, that is equivalency. Although general, it is reasonable, and has been uniformly applied.

Appellants' real complaint is that the Commissioner has not defined the word, equivalent, whereby appellants might have a set of directions for preparing a successful request for exemption. As desirable as this might be, this Court finds no legal justification for compelling the Commissioner to do so.

■ By omitting to establish or mandate guidelines, the Legislature has left non-degreed parents the task of presenting to the Commissioner a set of qualifications so compelling that the refusal of an exemption would be so unreasonable, arbitrary and capricious as to be unlawful and judicially correctable by common law certiorari.

■ This Court does hold that the statutory provision, "may request" does mandate a reasonable and responsible administrative consideration of the request and a response thereto in such a manner as to be judicially reviewed by certiorari. By this means, the inherent power of the courts to restrain unreasonable, arbitrary or capricious administrative actions may be exercised in appropriate cases.

■ Such review must by its nature be sought in individual cases and not in a group or class action. The only appropriate relief in the present case is a direction to the Commissioner to give appropriate attention to the details of each application, including the evidence of qualifications submitted therewith, to preserve for review all that is considered in reaching a decision, and a reasonably comprehensive and intelligible decision.

■ Appellants assert that, the Commissioner has arbitrarily erected an insurmountable obstacle to those who request exemption by applying an "imaginary equivalency standard". This Court does not agree. The General Assembly established a general standard of a baccalaureate degree. There is no requirement that anything less than its equivalent be accepted. If the General Assembly desires to permit teaching by one having less than a baccalaureate degree or its equivalent, the law should be amended to so state. If the General Assembly intends to delegate to an administrative official the authority to permit teaching by anyone not qualified by a baccalaureate degree or equivalent, the law should be amended to so state.

■ Appellants next insist that the qualification of a teacher should be judged by pupil progress rather than teacher preparation. This is a reasonable statement, but it overlooks the "lag-time" in assessment of pupil progress. That is, by the time pupil progress can be measured at the end of the year, it is too late to recover the lost year under an unqualified teacher. Qualification of teachers renders a prospective evaluation, whereas pupil progress renders a more meaningful, but retrospective evaluation.

Moreover, the principle urged by appellants is not mandated by the statute as grounds for exception to the required degree rule.

Appellants assert that the statutory words, "on a year to year basis" imply that the annual progress of the pupil, rather than the qualification of the parent is the sole criterion for granting exception. This Court does not agree. If, prior to applying for exemption, the applicant has conducted a home school, the results of prior instruction could be a meaningful but not the sole consideration in granting or refusing exemption to permit higher instruction. If, however, the applicant has no prior history of home instruction, the application can be considered only on the basis of the qualification of the applicant. Upon the second annual application, the progress of the pupil during the first year would be a proper, but not the sole consideration in granting or refusing exemption for the second year.

Appellants insist that the courts should require the Commissioner to adopt "an appropriate and reasonable basis for evaluating requests for exemptions, as recommended by appellants' expert".

Where an administrative action is reasonable, it is not for the courts to dictate to the administrative authority a different action which an expert or the courts might deem more reasonable.

Appellants next insist that the policy of "blanket denial of all requests" violates due process. Although denials have been consistent, there is no evidence that each request has not been considered separately or that there is no possibility of the granting of such a request. This aspect of the problem has already been discussed and does not require further discussion.

Appellants insist that it was the duty of the Commissioner to search for, find and consider evidence to support each decision to deny exemption. This Court does not agree. The burden of establishing entitlement to exemption is upon the applicant, and failure to carry that burden is ample justification for denial of exemption.

Appellants cite *In Re: Billing and Tariffs of South Central Bell*, Tenn.App.1989, 779 S.W.2d 375. In that case the administrative agency, on its own motion and without a hearing, directed certain utilities to amend their billing procedures and scheduled a hearing at a later date to permit the utilities to show cause why they should not make the amendment. This Court said:

> Whatever arguments may be made in favor of the Commission's Final Order, it cannot be denied that in making it, the Commission is regulating rates, albeit under limited circumstances.... To the extent that the order amending the billing procedures constitutes rate regulation, it must be evaluated as such. When that evaluation is made, the order fails under T.C.A. § 4–5–322(h)(4) and (5) in that no evidence was taken as to costs, capital investments, relative rates of return and other factors which must be considered in order to establish rates.

In the cited case, the agency took affirmative action sua sponte without supporting evidence. In the preset case, the Commissioner *declined to take* affirmative action requested by applicants for lack of sufficient evidence to support the applications. The cited authority is not applicable.

Appellants cite *Brooks v. Fisher*, Tenn. App.1985, 705 S.W.2d 135, which was a common law certiorari review of the zoning board's denial of a permit to use property as a fraternity house. This Court found that the zoning ordinance granted the absolute right to use the property upon compliance with reasonable conditions imposed by the board, and that the zoning board unreasonably denied the permit. In the present case, the statute does not grant the plaintiffs the absolute right to exemption, but only the privilege of requesting exemption and, by implication, a fair consideration of the request. The Commissioner has determined that the sole condition of granting exemption is qualification equivalent to a baccalaureate degree. None of the plaintiffs have shown equivalence to the satisfaction of the Commissioner. If a decision of the Commissioner should be so arbitrary, capricious or unreasonable as to justify judicial relief, each applicant has the remedy of common law certiorari, but not by group action.

Appellants next insist that the Commissioner has violated their rights to instruct their children and teach them religion as guaranteed by the United States Constitution. Authorities cited by appellants are not found applicable to the present case.

The State has a compelling interest in the proper schooling of all children. Pursuant to this interest, the State has the power to compel attendance upon duly established public schools or their equivalent. 79 C.J.S. Schools and School District § 363–pp. 390 et seq. No violation of constitutional rights by the Commissioner is shown in this case.

Plaintiffs assert that their constitutional right to the free exercise of religion and to educate their children requires that the Commissioner grant their application for exemption.

The government has the power to see that the children of its citizens receive an education according to reasonable mini-

mum standards from instructors having minimum qualifications. The free exercise of religion or of right to control education cannot be used to defeat this power of government.

The power in the government to prescribe educational standards and the right of parents to exercise religion and educate their children are not necessarily inconsistent, and neither should be used as a weapon to impair or destroy the other. Both the power and the right are fully capable of coexisting, and they should be permitted to do so.

The complaint does not request that the statute or any part of it be declared unconstitutional.

The foregoing disposes of the first issue tendered by appellants.

By their second issue, appellants urge that the strict enforcement of the statutory requirement for notice to local school boards by August 1 of each year violates a constitutional right to free travel and equal protection.

■ The complaint about travel restriction has been rendered moot by two memoranda issued to all superintendents of education in the state indicating that:

[T]he August 1 deadline will no longer apply to parents who were conducting home schools in another state and who move into Tennessee after August 1 in which to conduct a home school in Tennessee.

The Commissioner has effectively granted the relief which recent arrivals request in this case.

■ Nevertheless appellants insist that the strict enforcement of the August 1 deadline unconstitutionally discriminates against those whose children are attending public school but who, during the school year (after August 1) desire to remove their children from public school and teach them religion in the home.

While absolute freedom and flexibility to attend or not attend public school or home school at will may be desirable to some, it does not comport with the orderly conduct of a school system provided for all the children of the state.

The exception for continuing home instruction after arriving in the state is not calculated to place an undue and unexpected burden upon a school system, because the new arrivals have not been planned for and their absence will not upset the planning for the school year. Resident students will be expected to attend unless notice is received by August 1 (before the beginning of the school year), and their absence will affect adversely the operation of the school system for the year.

With the exception for new arrivals, the August 1 deadline for requests for exemption is reasonable and valid; and its enforcement does not infringe upon any constitutional right.

Appellants complain of the refusal of class certification. As has already been discussed, the consideration of requests for exemption should be on a case-by-case basis. In this light, a class action would not be appropriate. As stated by the Trial Judge, the defendant is a State official, and any relief granted to the present plaintiffs would undoubtedly be extended voluntarily to others similarly affected.

The situation as viewed by this Court is not appropriate for a class action.

Finally, appellants complain of the refusal of injunctive relief. There is no showing of any injury being presently inflicted upon plaintiffs which would be removed or reduced by injunction. If any plaintiff desires to file a further request for exemption with supporting evidence of equivalency, there is no reason to doubt that it will be considered and decided in conformity with this opinion, subject to such judicial review as may be appropriate.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against appellants. The cause is remanded to the Trial Court for such further proceedings, if any, as may be necessary.

Affirmed and remanded.

WILLIAM H. INMAN, Special Judge, concurs.

KOCH, J., files separate opinion concurs in part and dissents in part.

KOCH, Judge, concurring in part and dissenting in part.

This appeal raises important issues concerning Tennessee's home school statute. A group of parents, seeking to represent the growing number of parents who wish to educate their children at home instead of in the public schools, filed an action in the Chancery Court for Davidson County alleging that the Commissioner of Education was violating their constitutional rights by administering the home school statute in a manner inconsistent with the General Assembly's intent. The trial court, sitting without a jury, denied the parents' request for class certification and dismissed their complaint on the merits.

The majority has affirmed the trial court's decision in all respects. I concur with the results of the majority's opinion with regard to the denial of class certification and the validity of the statutory deadline for filing home school applications. I do not, however, concur with the majority's conclusion with regard to the commissioner's disposition of the requests for exemptions from the baccalaureate degree requirement permitted by Tenn.Code Ann.

§ 49–6–3050(b)(7) (1990). The commissioner's conduct is plainly inconsistent with the home school statute and is so arbitrary that it violates due process.

I.

This dispute concerns the criteria for granting the exemptions permitted by Tenn.Code Ann. § 49–6–3050(b)(7). Since the statute specifically authorizes these exemptions but fails to specifically provide the standards by which they should be granted, we must look to history of the statute's enactment to make sure that we are giving the fullest possible effect to the General Assembly's decision to permit exemptions.[1]

The General Assembly's consideration of the home schooling issue began in earnest in 1984 after home schooling parents in two counties successfully defended themselves in prosecutions under the compulsory attendance law.[2] In response to these decisions, two bills dealing with home schools were introduced in the second session of the Ninety–Third General Assembly. One bill prohibited home schools,[3] while the other permitted them.[4] Rather than passing either bill, the General Assembly created a special joint committee "to study the issue of compulsory attendance and its effect on

---

**1.** The courts' responsibility in construing statutes is to ascertain and to give the fullest possible effect to the General Assembly's intentions. *Westinghouse Elec. Corp. v. King,* 678 S.W.2d 19, 23 (Tenn.1984), *cert. denied,* 470 U.S. 1075, 105 S.Ct. 1830, 85 L.Ed.2d 131 (1985). When the statute itself does not clearly reflect the General Assembly's intent, the courts frequently consult the statute's legislative history. *Universal Computing Co. v. Olsen,* 677 S.W.2d 445, 447 (Tenn. 1984); *Chapman v. Sullivan County,* 608 S.W.2d 580, 582 (Tenn.1980); *Watts v. Putnam County,* 525 S.W.2d 488, 492 (Tenn.1975).

The Attorney General and Reporter filed a "certified copy of [the] audio tape transcriptions" of the debates surrounding Tenn.Code Ann. § 49–6–3050's enactment in the trial court. This exhibit was properly included with the appellate record and transmitted to the clerk of this court; however, it was discovered missing sometime after the submission of the case. Neither party has sought to replace the exhibit even though they have been notified that it is missing, and the majority has not seen fit to order

the record corrected in accordance with Tenn. R.App.P. 24(e).

The majority apparently does not share my view of the relevance of the General Assembly's debates because they have decided this case without considering them. Nonetheless, I have personally listened to the original tapes of all the legislative debates concerning the bill. The portions of the debates cited herein are my own transcriptions of the relevant recordings and are not taken from the missing exhibit.

**2.** The parents were apparently able to convince the trial courts that the compulsory attendance law was vague because it lacked a definition of "private school." Their arguments were patterned after similar lawsuits in Georgia and Wisconsin. *See Roemhild v. State,* 251 Ga. 569, 308 S.E.2d 154 (1983); *State v. Popanz,* 112 Wis.2d 166, 332 N.W.2d 750 (1983).

**3.** Senate Bill No. 1116/House Bill No. 1033.

**4.** Senate Bill No. 2023/House Bill No. 2009.

public and private schools and on the rights of parents." [5]

The special joint committee submitted its report to the first session of the Ninety–Fourth General Assembly in February, 1985.[6] The report recommended that the compulsory attendance law should be satisfied "by either (1) public school attendance, (2) church-related or private school attendance, or (3) home school attendance." It also recommended that home schools meet several stringent requirements, including:

> (1) students in home schools should be required to take the same tests given to public school students in grades 3, 6, 8, and 10 and that they be returned to public schools if they fall more than six-months behind;
>
> (2) parents conducting classes from kindergarten through the eighth grade must possess a high school diploma or a GED; and
>
> (3) parents conducting high school classes in the ninth through the twelfth grade must possess at least a baccalaureate degree.[7]

These minimum education requirements were apparently stricter than most of the other states' laws regulating home schools.

Thereafter, the chairman of the special joint committee introduced a bill in the Senate, and one of the other committee members introduced a companion bill in the House of Representatives based on the special joint committee's report.[8] These bills contained higher minimum education requirements than those recommended by the special joint committee. They required parents teaching from kindergarten through the sixth grade to possess a high school diploma or a GED and parents teaching from seventh through twelfth grade to possess "at least a baccalaureate degree awarded by a college or university accredited by an accrediting agency or association recognized by the State Board of Education." *See* Senate Bill No. 178/House Bill No. 418, Section 3(b)(7).

The protracted legislative debates, both in committee and on the floor, reveal that the baccalaureate degree requirement was a contentious issue from the very beginning. On one side of the debate were legislators, including several members of the special joint committee, who insisted that the requirement was unnecessary because the students being taught at home would be tested and would be returned to public school if they fell behind. On the other side were those who insisted that a baccalaureate degree should be required because college graduates had a broader educational background and would be better able to find the educational resources needed by their children.

The Senate Education Committee took up the bill on February 13, 1985. Senator Burks, a member of the special joint committee, proposed an amendment that would have deleted the baccalaureate degree requirement entirely, stating that "as long as this student takes this test, and he's up to par, then I see no need for it." With specific regard to whether possession of a baccalaureate degree is a reliable indicator of a parent's ability to teach, he noted:

> ... if you just say you have a baccalaureate degree, and that can be in a lot of fields, it doesn't mean that you can teach a child algebra or calculus or anything else that you might have in high school. It doesn't mean a thing. It just says you have a baccalaureate degree which is in itself a weakness of that concept.

Senator Dunavant, the bill's sponsor, responded to Senator Burks' comments by pointing out that "you can't teach something you don't know" and that adopting the amendment would "narrow the curriculum opportunities for that child" because

---

5. Act of May 23, 1984, Senate Joint Resolution 216, 1984 Tenn.Pub. Acts 1286.

6. *Report of the Special Joint Committee on Home Instruction/Compulsory Attendance, SJR 216,* Feb. 1985 ("Special Joint Committee Report"). The report is on file in the Legislative Library.

7. Draft Proposal on Revisions to the Compulsory Attendance/Home Study Law, p. 2, Special Joint Committee Report.

8. *See* Senate Bill No. 178/House Bill No. 418.

a "baccalaureate degree person knows where to find and how to find the resources, as a group, more than these people with a high school education." Senator Dunavant also explained:

> But I learned, not too subtly, that many of these people who are teaching in elementary grades—through grade eight—are depending on materials that they buy from a place and are learning the material as they teach it to their child. Now, that's not evil, that's commendatory that the parent would spend his time and effort with that. But how long can you risk that and how far can that parent go? And again … You know, in the ninth grade I had an English teacher who made "The Lady of the Lake" by Sir Walter Scott live. It sang to me. If you don't know "The Lady of the Lake," if you don't know who Sir Walter Scott is, how can you do that? If you don't know some of the secrets that are hidden behind what you are teaching in chemistry or biology, how can you teach that? If you don't understand history and political science, and some of the things that have caused history to be like it is, and events to come as they have come, how can you teach that? This is not a game we are playing … this is a step backward. It's absolutely a step backward.

The amendment failed, but Senator Burks and its other proponents vowed to renew their efforts when the bill reached the Senate floor.

The same debate ensued when the full Senate took up the bill on the March 13, 1985. The Senate tabled an amendment that would have limited the baccalaureate degree requirement to parents teaching children in the ninth through the twelfth grades, even though Senator Dunavant agreed to the change. Because of the fate of this amendment, Senator Burks withdrew his amendment that would have totally deleted the baccalaureate degree re-

quirement, and two of Senator Dunavant's co-sponsors asked that their names be removed from the bill. After Senator Dunavant declined to delay the final vote, the bill failed to receive sufficient votes for passage and was sent back to the Calendar Committee.[9]

After the bill failed to receive a constitutional majority in the Senate, its sponsors, representatives of the Department of Education, representatives of the parents interested in home schooling, and other interested parties met to work out a compromise proposal. The results of these discussions were presented to the House Education Committee and to the full Senate on April 17, 1985.

The House Education Committee considered the bill on the morning of April 17, 1985. Representative Wood, the bill's sponsor, proposed the compromise amendments worked out following the Senate's failure to pass the bill. One of his amendments would have conformed the bill to the special joint committee's original proposal that parents with a high school diploma or a GED should be permitted to teach their children from kindergarten through the eighth grade. During the ensuing debate before the amendment was defeated,[10] Representative Cobb, a member of the House Education Committee, explained:

> I have a great deal of sympathy for what my distinguished colleague Representative Turner has said and what my distinguished colleague, Representative Bivens is about to say. But there's one aspect of this bill that I think we need to stress over and over again. And that is that what we're doing here is putting strict—and it's something I've insisted on all along—strict output requirements on these "home schools." We are requiring that these youngsters be tested periodically, and if they fall behind in their grade level, that remedial steps be taken, or they end up being placed in a regular school situation under the law. What

---

9. *See* 1985 Senate Journal 476.

10. In light of the later adoption of the bill, the committee's rejection of the amendment is not an indication that the General Assembly ulti- mately disapproved of the amendment or its purpose. *See Clanton v. Cain–Sloan,* 677 S.W.2d 441, 445 (Tenn.1984).

we've done here in this bill is move slightly away from our normal way of looking at things—what is the dollars per student, what are the numbers of books, what is the hours of teaching, what is the qualification of the teacher—to the output. And if the kids don't measure up under the teaching they're getting from their parents, we'll catch it, and they'll be required to be placed in the public school system.

\* \* \* \* \* \*

The other reason why I think that the bill can work is that the reason that the college diploma is not as necessary is that many, many people with college diplomas such as mine having nothing to do with early childhood education. In short, while I've got more college degrees than I probably need, and most of it probably didn't sink in, none of it was in early childhood education. So my education really wouldn't help me deal with this young kid. I'd be scared to death to do it which is why I wouldn't do it. So the college degree might not necessarily help with that, yet anyone with a high school diploma or GED equivalent would have the content—the arithmetic, the division, the reading, those kinds of skills, and they should have that. The college diploma doesn't add necessarily to the early childhood development processes that we might like to have in every case.

Later, Representative Wood proposed another compromise amendment that would have allowed the Department of Education to grant exemptions from the baccalaureate degree requirement. He explained that the amendment

would allow the Department of Education to evaluate the effectiveness of a parent that would be teaching, and as it progressed through the subjects and through the grades, to evaluate the performance level and the testing abilities that have been developed in that child. And provided, however, that the teacher may request from the Department of Education an exemption from the baccalaureate degree requirement if approved by the Department of Education solely at

their discretion, if proper progress is being made, and the Department of Education would grant an exemption from this on a year-to-year basis, not a permanent exemption.

Responding to the committee chairman's concerns about the amendment, Representative Wood explained that the exemption would be granted only

if the teaching process is going on and if approved by the Department of Education on an individual basis year-to-year. The purpose of the amendment is that the end result of home education or public education or any other form would be by the product that we do turn out, by the job that's done, and by the skills developed. And let the end result be the determining factor.

Representative Cobb, echoing Senator Burks' earlier remarks to the Senate, stated:

But let's face facts. Maybe we've got people here—maybe I'm one of them—that, you know, a baccalaureate degree doesn't necessarily mean that you've learned a whole lot or that you've got common sense or that you could teach. I think, on average, I would rather have people who have qualifications teaching. But there may be those rare exceptions in which somebody has done many things, and I know a few people like this who don't have credentials, but they've got the knowledge, they've got the learning. I know of the Department of Education's orientation toward credentials, and so I have no fear that these waivers will be granted on an excessive basis. But somebody who's got three years of college and has gone to Europe and studied and done this, that, and the other, and they just don't have the B.A., there may be a place for something like this.

The committee did not approve this amendment, just as it had not adopted the other compromise amendments preceding it.

During the afternoon of April 17, 1985, the full Senate considered the bill and the same amendments that had been rejected by the House Education Committee earlier in the day. Senator Dunavant announced

that compromise amendments had been prepared addressing the concerns of the parents wishing to teach their children at home. One of these amendments limited the baccalaureate degree qualification to parents who were teaching in grades nine through twelve and provided that "a parent-teacher may request an exemption from this requirement from the Department of Education on a year-to-year basis."[11] The full Senate adopted the amendments, passed the amended bill, and sent it to the House of Representatives for consideration.

The full House of Representatives took up the home school issue on May 8, 1985. It substituted the House Bill with the bill passed by the Senate[12] and then passed the Senate Bill after adding seven amendments of its own, none of which dealt with the minimum educational requirements for the parents.[13] The Senate concurred in all but one of the House amendments on May 16, 1985,[14] and the House of Representatives reconsidered and withdrew this amendment on May 21, 1985.[15] The Governor signed the bill on May 28, 1985, and the portions at issue on this appeal took effect on July 1, 1985 and are codified as Tenn.Code Ann. § 49–6–3050. *See* Act of May 21, 1985, ch. 398 § 5, 1985 Tenn.Pub.Acts 764, 768.

## II.

This appeal requires the court to balance the rights of parents to teach their children at home with the State's interest in ensuring that its citizens receive an adequate education. The rights the parents are asserting are among the most fundamental rights secured by the federal and state constitutions. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Wisconsin v. Yoder,* 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–

42, 32 L.Ed.2d 15 (1972); *In re Knott,* 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re Riggs,* 612 S.W.2d 461, 469 (Tenn.Ct. App.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). Therefore, the scales in the analysis are weighed in favor of the parents, and the State must justify its regulatory requirements by demonstrating that they further a compelling governmental interest. *Bob Jones Univ. v. United States,* 461 U.S. 574, 603, 103 S.Ct. 2017, 2034, 76 L.Ed.2d 157 (1983); *State ex rel. Swann v. Pack,* 527 S.W.2d 99, 111 (Tenn.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

The parents in this case do not, and indeed cannot, contend that the State does not have a compelling interest in the education of their children. Education is a "prime object of American government." *Ballentine v. Mayor and Aldermen of Pulaski,* 83 Tenn. 633, 642 (1885). It awakens children to our society's cultural values and prepares them to be active citizens and to live whatever life style they choose. *Plyler v. Doe,* 457 U.S. 202, 220 n. 20, 102 S.Ct. 2382, 2397 n. 20, 72 L.Ed.2d 786 (1982); *Ambach v. Norwick,* 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979); *Wisconsin v. Yoder,* 406 U.S. at 239–40, 92 S.Ct. at 1545 (White, J., concurring); *Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

Tennessee has recognized since its earliest days that education is a governmental function. *Davidson County v. City of Nashville,* 190 Tenn. 136, 138, 228 S.W.2d 89, 90 (1950); *Board of Educ. v. Shelby County,* 155 Tenn. 212, 218, 292 S.W. 462, 463 (1927). Following its amendment in 1978, Article XI § 12 of the Constitution of Tennessee provides, in part:

The State of Tennessee recognizes the inherent value of education and encour-

---

**11.** *See* Amendment No. 14, 1985 Senate Journal 833–834. This amendment was identical to the one that the House Education Committee declined to adopt several hours earlier.

**12.** Even though the House Education Committee did not approve the amendment permitting exemptions from the minimum education requirements, it became part of the bill when the House adopted the motion to substitute and

conform the House Bill with the Senate Bill. The exemption provision was already in the Senate Bill.

**13.** *See* 2 1985 House Journal 1269.

**14.** *See* 1985 Senate Journal 1222.

**15.** *See* 2 1985 House Journal 1456.

ages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools.

In light of this constitutional recognition of the importance of education, it is not difficult to find, as other courts have, that the State has a compelling interest in ensuring that all its citizens receive an adequate education. *See Murphy v. Arkansas,* 852 F.2d 1039, 1041–42 (8th Cir.1988); *Blackwelder v. Safnauer,* 689 F.Supp. 106, 130–31 (N.D.N.Y.1988).

In the face of the State's compelling interest in education, parents have neither the right to educate their children unfettered by reasonable governmental regulation nor the right to replace the State's educational requirements with their own idiosyncratic views of what knowledge a child needs. *Runyon v. McCrary,* 427 U.S. 160, 177–78, 96 S.Ct. 2586, 2597–98, 49 L.Ed.2d 415 (1976); *Wisconsin v. Yoder,* 406 U.S. at 239, 92 S.Ct. at 1545 (White, J., concurring). It is now beyond dispute that the State has the power to reasonably oversee and supervise not only the schools but also the teachers and students. *Runyon v. McCrary,* 427 U.S. at 178–79, 96 S.Ct. at 2598; *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925).

### III.

Recognizing the State's authority to regulate home schools should not end the inquiry. The importance of the personal rights involved in this case require an examination of both the statute governing home schools and the manner in which the Department of Education has construed and implemented the statute.

### A.

Statutes burdening or affecting fundamental rights must be sufficiently clear to enable persons of ordinary intelligence to know what is prohibited or required so they may act accordingly. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *City of Clarksville v. Moore,* 688 S.W.2d 428, 429–30 (Tenn.1985); *State v. Netto,* 486 S.W.2d 725, 728 (Tenn.1972). They must also contain basic standards for the authorities' guidance, *Lobelville Special School Dist. v. McCanless,* 214 Tenn. 460, 463–64, 381 S.W.2d 273, 274 (1964), because the General Assembly cannot leave their enforcement solely to the authorities' subjective whim and caprice. *Grayned v. City of Rockford,* 408 U.S. at 108–09, 92 S.Ct. at 2299; *Gatlinburg Beer Regulation Comm. v. Ogle,* 185 Tenn. 482, 487, 206 S.W.2d 891, 893 (1947).

The degree of specificity required depends upon the nature and subject matter of the enactment. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Jeffery v. O'Donnell,* 702 F.Supp. 516, 519 (M.D.Pa.1988). When a statute affects constitutionally protected rights, it will be held to a higher standard because the consequences of imprecision are more severe than might be the case with purely economic regulations. *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974); *Blackwelder v. Safnauer,* 689 F.Supp. at 125. This is especially true when a violation of the statute carries a criminal penalty. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 499, 102 S.Ct. at 1193; *Grayned v. City of Rockford,* 408 U.S. at 109, 92 S.Ct. at 2299; *Ellis v. O'Hara,* 612 F.Supp. 379, 380–81 (E.D.Mo.1985).

Tenn.Code Ann. § 49–6–3050 affects fundamental rights because it limits parents' freedom of choice in matters of family life. Parents violating the statute run the risk of being prosecuted under the compulsory attendance law.[16] This risk is more real than theoretical for parents in Tennessee desiring to teach their children at home.

---

16. Tenn.Code Ann. § 49–6–3009(a) (1990) provides that "[a]ny parent, guardian or other person who has control of a child, or children, and who violates the provisions of this part is guilty of a Class C misdemeanor."

The Department of Education has conceded that it routinely threatens to withhold state funds from local school systems that fail to prosecute unapproved home schooling parents for truancy. The local school systems, succumbing to this pressure, have actually prosecuted parents teaching their children at home, including two of the parents who are parties in this case.

The statute explicitly provides for exemptions from its own baccalaureate degree requirement and empowers the Department of Education to grant these exemptions on a year-to-year basis. However, it contains no basic standards to guide the department's decision-making process. While the lack of standards is not surprising given the division of opinion in the General Assembly concerning this issue, the absence of standard renders the statute constitutionally suspect on its face.

### B.

Tenn.Code Ann. § 49–6–3050(b)(7) should not be considered in a vacuum without also considering the regulatory refinements or limiting construction placed on it either by the Department of Education or by the courts. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5; *Grayned v. City of Rockford,* 408 U.S. at 110, 92 S.Ct. at 2299–300; *Jeffery v. O'Donnell,* 702 F.Supp. at 519–20; *Blackwelder v. Safnauer,* 689 F.Supp. at 121.

The courts are confronted with two questions when they review an executive agency's construction of a statute. The first question is whether the General Assembly has spoken directly to the precise question at issue. If the General Assembly's intent is clear, the examination need proceed no further because both the courts and the agency must give effect to the unambiguously expressed legislative intent. *Roddy Mfg. Co. v. Olsen,* 661 S.W.2d 868, 871 (Tenn.1983); *Anderson v. Outland,* 210 Tenn. 526, 532, 360 S.W.2d 44, 47 (1962).

If, however, the General Assembly has not directly addressed the precise question at issue, the court should not simply impose its own construction on the statute without considering the construction of the agency charged with enforcing it. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The agency's construction is entitled to respect and should be given appropriate weight. However, the courts are ultimately responsible for interpreting statutes, *Neff v. Cherokee Ins. Co.,* 704 S.W.2d 1, 3 (Tenn.1986); *Nashville Mobilephone Co. v. Atkins,* 536 S.W.2d 335, 340 (Tenn. 1976), and are not bound by an agency's construction, especially if it is contrary to the legislative intent or if it undermines the statute's constitutionality. *See State ex rel. Chapdelaine v. Torrence,* 532 S.W.2d 542, 547 (Tenn.1976), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1977); *Westate Oil Co. v. Featherstone,* 208 Tenn. 631, 635, 348 S.W.2d 299, 301 (1961).

Tenn.Code Ann. § 49–6–3050(b)(7) does not directly address the precise issue involved in this case because it does not contain standards for granting exemptions for the baccalaureate degree requirement. Thus, it is appropriate to review the Department of Education's construction of the statute. Instead of shoring up the statute's deficiencies, the department's construction of its authority to grant exemptions has been arbitrary and subjective and, likewise, has been contrary to the General Assembly's intent.

### C.

The history of Tenn.Code Ann. § 49–6–3050 points to three compromises that were key ingredients to its passage. First, the General Assembly decided, after much debate, that parents need not always possess a baccalaureate degree in order to be qualified to teach high school courses to their children at home. Second, the General Assembly decided that the Department of Education, not the Commissioner of Education, should decide when exemptions from the baccalaureate degree requirement should be granted. Third, the General Assembly envisioned that the department's decision with regard to the exemptions

should, at least in part, be based on the child's educational progress.

The commissioner and his predecessor have ignored all these policy decisions during the six years since the statute's enactment. They have assumed responsibility to act on the requests for exemptions without first obtaining policy direction from the Board of Education as required by Tenn. Code Ann. §§ 49-1-102(a), -102(b) (1990) and Tenn.Code Ann. § 49-1-201(20)(A) (1990). They have also denied every request for an exemption without considering the child's educational progress. Finally, they have attempted to justify their decisions using reasons that are plainly inconsistent with the statute.

The commissioner insists in this court that his decisions and those of his predecessor with regard to requests for exemptions have been based on a careful evaluation of each parent's education and experience to determine whether they are "equivalent" to a baccalaureate degree. The evidence belies this claim. The "equivalency" rationale did not surface until the time this suit was filed. All the decisions from July, 1985 to October, 1989 were based solely on the parent's lack of a baccalaureate degree. It is obvious that the commissioner and his predecessor have sided with the legislators who insisted that a baccalaureate degree should be a mandatory requirement.

The commissioner and his predecessor have used a form letter, with several inconsequential variations, to deny every request for an exemption submitted before this suit was filed. On July 25, 1985, his predecessor denied the first application for an exemption, stating:

> It was the opinion of some members of the General Assembly that a person with only a high school diploma would not be qualified to teach the wide range of subjects required in either a general or college preparatory course in high school.
>
> In my judgment, the course work you have demonstrated beyond high school does not qualify you for an exemption from the baccalaureate degree requirement.

Another denial letter dated August 6, 1985 stated:

> As you are aware, the home school law ... requires that ... parents conducting classes in Grades 9–12 must have a baccalaureate degree from an accredited college or university. This requirement was debated at great length by the Legislature before the bill was passed. It was the opinion of some members of the General Assembly that a person lacking a college degree would not be qualified to teach the wide range of subjects required in either a general or college preparatory course in high school.

On August 9, 1985, the commissioner's predecessor added the following to his denial letter:

> The intent of the law is not to allow parents who lack the baccalaureate degree requirement to conduct home schools by enrolling their children in correspondence courses.

The process and criteria for considering requests for exemptions did not change when the Administrations changed and a new commissioner took office in January, 1987. The new commissioner used substantially the same rationale to deny a request for exemption submitted by one of the parties in this case. In his August 4, 1987 letter to the Reverend Paul Williams, the commissioner stated:

> As you know, Tennessee law requires that a parent teaching his or her child at home in grades nine through twelve must possess "at least a baccalaureate degree, awarded by a college or university accredited by an accrediting agency or association recognized by the State Board of Education." Since you do not have a baccalaureate degree, you do not meet the requirement to conduct a home school for your daughter as provided in Tenn.Code Ann. 49-6-3050(b)(7).

Several days after denying the Reverend Williams' request for an exemption, the commissioner decided to add an additional justification to his form letter. In a letter date August 7, 1987, he stated:

> Since the General Assembly deemed the baccalaureate degree requirement to

be an appropriate credential for parents instructing their children in grades nine through twelve and since no standards for granting a waiver are provided in the statute, I am declining your request for an exemption.

The rationale for denying exemptions remained substantially unchanged until the time this suit was filed. In a letter dated October 12, 1989, the commissioner invoked the "equivalency" standard for the first time, stating:

Further, the law provides "possession of at least a baccalaureate degree...." as a minimal requirement for parents conducting classes in grades 9–12. In the absence of educational or other experience equivalent to the mandated baccalaureate degree, I am declining your request for an exemption.

Throughout this litigation, neither the commissioner nor his staff have been able to articulate precisely what they perceive "equivalency" to be. However, the effect of their rationale can be judged by its results. Since Tenn.Code Ann. § 49–6–3050(b)(7)'s enactment, either the commissioner or his predecessor have denied exemptions to (1) a parent possessing a teacher's license from another state, (2) a parent possessing a Tennessee substitute teacher's license, (3) the head of the Christian education program of one of the nation's largest Baptist churches, (4) a parent with 71 semester hours of college credit, (5) a parent with an associate degree in accounting and 42 hours of business administration and 14 hours of teaching credits, and (6) a parent who is a member of Mensa, an organization whose members have the highest I.Q.'s in the country.

In light of the two commissioners' conduct since 1985, I can reach no conclusion other than that their construction of Tenn. Code Ann. § 49–6–3050(b)(7) frustrates the General Assembly's intent and is so vague and subjective that it is arbitrary and capricious. Contrary to the statute, neither commissioner has sought or received policy direction from the Board of Education concerning the standards for granting exemptions. They have stated that a baccalau-

reate degree is mandatory when it is not. They have justified denying exemptions on the lack of standards when neither they nor the Board of Education have attempted to develop standards even though they have the power to do so. Finally, they have in every case denied the exemption without giving any weight to the child's academic progress.

The commissioner cannot justify this conduct simply by falling back on his administrative discretion. While executive agencies have some discretion in exercising their delegated duties, *Tasco Developing & Bldg. Corp. v. Long,* 212 Tenn. 96, 104–05, 368 S.W.2d 65, 68–69 (1963), they are also required to faithfully execute and administer the laws enacted by the General Assembly. *Richardson v. Young,* 122 Tenn. 471, 493, 125 S.W. 664, 668 (1910).

Discretion is not a license to act arbitrarily or contrary to the General Assembly's intent. Nor can it support an administrative construction that renders a statute useless or unconstitutional. *See State v. Netto,* 486 S.W.2d at 728; *Illinois Cent. R.R. v. Crider,* 91 Tenn. 489, 506, 19 S.W. 618, 623 (1892); *Tucker v. McDell's, Inc.,* 50 Tenn.App. 62, 68, 359 S.W.2d 597, 599–600 (1961).

I would find that the commissioner's construction of Tenn.Code Ann. § 49–6–3050(b)(7) is arbitrary and discriminatory because it does not provide fair notice of the requirements for obtaining an exemption and because it permits ad hoc, subjective dispositions of requests for exemptions. The commissioner's actions have exacerbated the General Assembly's failure to include basic standards in the statute to guide the department's decisions.

As foretold by Representative Cobb in the 1985 legislative debates, the commissioner has substituted his preference for "credentials" for the consideration of the parents' abilities and the children's performance and progress. The parents have a fundamental right to have their requests for an exemption under Tenn.Code Ann. § 49–6–3050(b)(7) reviewed objectively using explicit standards.

Accordingly, I would hold that the Department of Education should not be permitted to deny requests for exemptions pursuant to Tenn.Code Ann. § 49–6–3050(b)(7) until objective standards and criteria have been prepared. While the General Assembly may, of course, provide these standards by proper amendments to the statute, the standards may also be supplied by the Board of Education pursuant to Tenn.Code Ann. § 49–1–102(a).